Filed 6/27/13  P. v. Amaya CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B241108 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380072) |
| v. | |
| EVARISTO AMAYA, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Lisa B. Lench, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Evaristo Amaya was convicted by jury of sex crimes involving three minor victims, including three counts of lewd act upon a child (Pen. Code, § 288, subd. (a)),[1] one count of aggravated sexual assault of a child (§ 289, subd. (a)), and one lesser included count of assault (§ 240). Multiple victim special allegations pursuant to section 667.61, subdivisions (b) and (e) were found true. Defendant was sentenced to an aggregate state prison term of 30 years to life. Defendant was awarded 546 days of presentence custody credits and ordered to pay various fines and fees, including a $1,000 restitution fine pursuant to section 1202.4. Defendant raises multiple claims of instructional error, and also argues it was error for the trial court to have denied his motion to suppress his statements to police officers, and that the victim restitution fine is punitive and was imposed in violation of his constitutional rights. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

The events at issue in this case took place between 2002 and 2004, and 2009 through 2010, and involved three separate minor female victims, all under the age of 14. Victims L.S. and A.S. are sisters and defendant is their uncle. He is married to one of the sisters of the girls' mother. The third minor victim is M.A.,[2] the daughter of friends of defendant.

In 2002, defendant was living with his wife and her son from a previous relationship (defendant's stepson) in an apartment across a driveway from a duplex where L.S. and A.S. lived with their parents and their brother. Around this time, and continuing for a period of months, defendant regularly came over to L.S. and A.S.'s house, asking to borrow certain items, like milk or juice for his stepson. Defendant would often come over when L.S. was home alone, because L.S.'s parents and younger siblings left for school and work before L.S. took the bus to her school.

---

[1]     All further undesignated section references are to the Penal Code.

[2]     We refer to the minor victims by their initials to protect their privacy. M.A. is referred to in the information as M.F., but we refer to her by the initials she gave during her testimony.

2

Sometimes defendant would knock on the window near the bathroom when L.S. was showering. When defendant came over to borrow things, he usually did not leave right away, but would come inside and engage L.S. in conversation. He started touching L.S. during these visits (beginning when L.S. was 11 years old), first just rubbing her shoulders or sitting close to her on the couch. Then he began to rub or touch her breasts over her clothing. He progressed to putting his hands inside her pants and touching her vagina. This conduct frightened L.S. and she would say she needed to get to school, but defendant would reply that if she missed the bus, he would drive her to school. Occasionally, defendant would take L.S.'s hand and hold it on top of his penis and rub her hand back and forth.

One time when defendant had cornered L.S. on the couch, he pushed her down onto the mattress at the foot of the couch. He took off her clothes and lay down on top of her. L.S. was scared, but could not get up because defendant held her down. Defendant penetrated her vagina with his penis, and also with his finger. He eventually stopped when L.S. repeatedly told him no, and said he was hurting her.

Defendant also was alone on occasion with A.S. He touched her several times on her buttocks, sometimes over her clothes and sometimes under. It happened at least one time when A.S. was riding in the front passenger seat of defendant's car. Several incidents also occurred at defendant's home, when A.S. had been invited over to play or watch movies with her cousin (defendant's stepson). One incident occurred when A.S. was at defendant's apartment and he offered her $1 to read a book. While she was reading, defendant started putting his hand down the back of her pants. His hand was inside her clothes against her skin and came close to touching her vagina. She felt disgusted and scared to say anything, feeling no one would believe her.

At some point after the incidents involving L.S. and A.S., defendant and his family moved from their apartment across from the girls' home. By 2009, defendant was living with his wife, his stepson, and their daughter (born in 2007), at the home of a friend. The friend was M.A.'s stepfather. Defendant and his family lived in a detached guest room located on the same property as the house in which M.A. and her family lived.

3

One afternoon when M.A. was 12 years old, defendant asked her if she could help him with his computer. She said yes and accompanied him to his room. M.A. was alone with defendant. He told her to sit on the bed and placed the laptop computer on her legs. Defendant then sat behind her, and placed his arms around her so that he was embracing her. Defendant began to rub his hands up and down M.A.'s inner thighs, telling her that her hair smelled nice. Defendant stopped when he heard his wife calling him and left the room. The incident scared M.A. and made her feel "weird." She confided in her uncle Hugo about the incident, who in turn told M.A.'s mother. Defendant and his family then moved away.

Several months later, M.A. was texting with defendant's stepson. She sent a text with a picture of herself in shorts ("booty shorts") that she and a cousin had taken just "playing around." At some point, she received a text asking her to send more pictures and she said no. Then, she received a text with an unusual amount of misspellings. She sent a text asking who was texting her. M.A. eventually received a text with a photograph of a penis. She did not believe it came from defendant's stepson. M.A. then received a text that told her to save the texts, because they were a "secret," and also expressing M.A. was "so sexy. I am older than you, but I like you so much." M.A. was concerned and scared by the texts and showed them to her mother, but she was afraid of making a "big deal" about it and of not being believed. M.A.'s parents reported the incident to the police.

Detective Jorge Oseguera of the Los Angeles Police Department was assigned to investigate M.A.'s report. During his investigation, Detective Oseguera learned of an earlier report regarding defendant made by L.S. and A.S. Detective Oseguera telephoned defendant, advised him of the report that had been filed, and asked if he would come speak with him about the allegations. Defendant agreed to be interviewed and went to the police station on October 4, 2010. At the start of the interview, defendant was told he was not under arrest and was free to leave at any time.

While Detective Oseguera was still asking background questions, defendant volunteered he was separated from his wife because of the "problem" with M.A., and he

4

really wanted "to fix this problem first" so they could be together again. He also voluntarily admitted to texting the photograph of his penis to M.A.

Defendant initially denied anything improper happened with L.S. and A.S. Detective Oseguera told defendant several times that he could fix things on a "family level" by apologizing to the girls because they did not want to press charges. He also told defendant that when someone tries to be accountable for their mistakes, it "counts for a lot" in an investigation.

Defendant eventually admitted to touching L.S. and confirmed he would apologize to all three girls to help resolve "the problem." Defendant then stated "and if . . . you're going . . . to make me face charges, I'll accept them." Detective Oseguera explained he was going to continue his investigation, and asked defendant about contacting him again if necessary, and defendant responded yes "whenever you want." Defendant was allowed to leave the station at that time.

Several months later, a warrant was issued and defendant was detained and brought to the police station for another interview on January 21, 2011. Detective Oseguera conducted the interview again, and read defendant his *Miranda* rights.[3] Defendant signed a written waiver and agreed to speak with the detective.

Detective Oseguera told defendant that during the course of his investigation over the last several months, he had spoken further with the victims and he needed to clarify a few more things. He said he hoped defendant would be honest, because when someone is willing to be held accountable it is given a "lot of weight" in an investigation.

Defendant admitted again that he sent the photograph of his penis to M.A, but did not admit he had touched her in his bedroom during the computer incident.

Defendant also admitted that what L.S. had told the detective was true. Detective Oseguera said defendant should explain what happened in his own words because he did not want to put words in defendant's mouth. Defendant explained that "we kissed" but, as the adult, defendant knew he "was supposed to stop that, you know, and I couldn't."

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

He admitted it was a mistake that should not have happened. He admitted he placed his penis against L.S.'s vagina on one occasion but denied penetration.

Defendant eventually admitted, without much detail, he also touched A.S. on her buttocks at least one time in his bedroom.

At several points, defendant expressed remorse and said he had "to fix this no matter what; I have to set it right" with the family and "I'm the liar, officer. I'm the liar, not them."

Near the end of the interview, Detective Oseguera asked defendant why defendant did not just explain everything earlier. Defendant said: "I was embarrassed, officer. It's embarrassing. No, it's not out of fear because if it was fear I would have denied it all from the beginning. You know what I'm saying? . . . But what for, officer, if one did it? Why not facing [*sic*] things? But it's embarrassing. Do you think I like to be telling you these things . . . ?"

In July 2011, defendant was charged with various sex offenses. Counts 1 through 4 concerned the victim L.S. Counts 1 and 2 alleged lewd act on a child under the age of 14 (§ 288, subd. (a)). Counts 3 and 4 alleged aggravated sexual assault on a child under the age of 14 (§ 269, subd. (a)(1), (5)) based on rape (§ 261, subd. (a)(2), (6)) and sexual penetration (§ 289, subd. (a)), respectively. Count 5 alleged continuous sexual abuse of victim A.S. (§ 288.5, subd. (a)). Counts 7 through 9 concerned the victim M.A. Count 7 alleged lewd act on a child under the age of 14 (§ 288, subd. (a)). Count 8 alleged the sending of harmful matter to a minor (§ 288.2, subd. (a)). Count 9 alleged improper contact with a minor for a sexual purpose (§ 288.3, subd. (a)). It was also specially alleged as to counts 1, 2, 5 and 7 that defendant had committed offenses against multiple victims within the meaning of section 667.61, subdivisions (b) and (e).

Trial by jury proceeded in January 2012. All three victims testified, as did Detective Oseguera. The parents of M.A. testified, and M.A.'s mother stated sometime after they made the police report, defendant came to their home and admitted that he sent the photograph of his penis to her daughter. A friend of L.S.'s testified to the fact that L.S. had confided in her about the mattress incident, but did not specifically recall L.S.

stating defendant had actually penetrated her vagina with his penis. Defendant's wife and one of her sisters testified for the defense, and both stated they had never seen defendant act inappropriately around L.S. or A.S.

The jury returned a verdict finding defendant guilty on counts 1 and 2 (lewd acts as to L.S.), count 4 (aggravated sexual assault of L.S.), count 5 as to the lesser included count of assault (A.S.), and count 7 (lewd act as to M.A.). The jury found the multiple victim allegations true as to counts 1, 2 and 7. The jury was unable to reach verdicts on counts 3, 8 and 9, and the court declared a mistrial.

Defendant was sentenced to a total state prison term of 30 years to life. The court selected count 4 as the base term and imposed a sentence of 15 years to life, plus a consecutive 15-to-life term on count 7, a concurrent 15-to-life term on count 1, and a concurrent six-month term on count 5. A 15-to-life term on count 2 was imposed and stayed pursuant to section 654. The court awarded total presentence custody credits of 546 days, and imposed various fines, including a $1,000 restitution fine, payable to the state fund, pursuant to section 1202.4.

This appeal followed.

## DISCUSSION

### 1. There Was No Instructional Error

Defendant raises four claims of instructional error. He argues CALCRIM No. 1110 contains an erroneous statement of law negating an element of the offense of lewd act on a child in violation of his constitutional rights. Defendant further contends CALCRIM No. 1110 is argumentative and biased in favor of the prosecution. Defendant seeks reversal on this ground only as to count 7.

Defendant also argues the trial court erred in failing to instruct sua sponte on the defense of a reasonable and good faith belief in consent to the aggravated sexual assault counts. And finally, defendant contends the modified version of CALCRIM No. 1191 on propensity evidence created an impermissible burden shifting presumption in favor of guilt.

7

Respondent contends all of defendant's claims of instructional error were forfeited by failure to object at trial, and that they also fail on the merits. We address each claim in turn, exercising our independent judgment in reviewing the propriety of the challenged instructions. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Sigala* (2011) 191 Cal.App.4th 695, 698 (*Sigala*).)

### a.    Forfeiture

Respondent contends defendant failed to preserve his objections regarding the alleged instructional errors. However, defendant raises the specter of a constitutional deprivation affecting his substantive rights in light of the alleged erroneous instructions. The failure to object or otherwise preserve a claim of instructional error in the trial court does not preclude appellate review "for constitutional error." (*People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; see also § 1259.) We shall consider the merits of defendant's claims.

### b.    CALCRIM No. 1110

Defendant contends the inclusion of the phrase "[t]he touching need not be done in a lewd or sexual manner" in CALCRIM No. 1110 directly conflicts with the express statutory language defining the nature of the crime of lewd act upon a child (§ 288, subd. (a)), confuses the jury and negates an essential element of the crime. Section 288, subdivision (a), provides: "Any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

Defendant argues the plain language of the statute requires proof the inappropriate touching of a minor was performed both "willfully and lewdly" and that CALCRIM No. 1110's inclusion of the sentence that the touching need not be done "lewdly" negates that element of the crime. We disagree. CALCRIM No. 1110, as presented to the jury below, correctly stated the law regarding the crime of lewd act upon a child.

8

The trial court instructed the jury with the full form language of CALCRIM No. 1110,[4] modified only as to appropriate pronouns and identification of the relevant counts, as follows: "To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant willfully touched any part of a child's body either on the bare skin or through the clothing, or the defendant willfully caused a child to touch her own body, the defendant's body, or the body of someone else, either on the bare skin or through the clothing; two, the defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child; and three, the child was under the age of 14 years at the time of the act. *The touching need not be done in a lewd or sexual manner.* Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required. It is not a defense that the child may have consented to the act. Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun." We have italicized the language defendant claims is objectionable.

The language of CALCRIM No. 1110 properly comports with the statutory elements of the offense of lewd or lascivious act on a child. In discussing the definition of a "lewd" act under section 288, the Supreme Court has explained the "statute itself declares that to commit such an act 'wilfully and lewdly' means to do so 'with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires' of the persons involved." (*In re Smith* (1972) 7 Cal.3d 362, 365 (*Smith*).) The focus of the offense is on the *intent* of the perpetrator. "[T]he courts have long indicated that section 288 prohibits *all* forms of sexually motivated contact with an underage child. Indeed, the 'gist' of the offense has always been the defendant's intent to sexually exploit a child, not the nature of the offending act. [Citation.] '[T]he purpose of the perpetrator in touching

**4**      The language reflects the form of the instruction in effect at the time of trial in January 2012. (CALCRIM No. 1110 (Summer 2011 ed.) p. 941.)

9

the child is the controlling factor and each case is to be examined in the light of the intent with which the act was done . . . . If [the] intent of the act, *although it may have the outward appearance of innocence*, is to arouse . . . the lust, the passion or the sexual desire of the perpetrator [or the child,] it stands condemned by the statute . . . .' [Citation.]" (*People v. Martinez* (1995) 11 Cal.4th 434, 444 (*Martinez*).)

The sentence to which defendant takes offense correctly states the law and makes clear to the jury the physical act of touching involved need not be seen as lewd or offensive *in and of itself*. Even a physical touching that may appear innocent, *if done with the requisite statutory intent*, can be found to be a prohibited act under section 288. "As suggested in *Smith*, we can only conclude that the touching of an underage child is 'lewd or lascivious' and 'lewdly' performed depending entirely upon the sexual motivation and intent with which it is committed." (*Martinez*, *supra*, 11 Cal.4th at p. 449; accord, *People v. Lopez* (1998) 19 Cal.4th 282, 289 ["*Any* touching of a child under the age of 14 violates [section 288, subdivision (a)], even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim."]; see also *Sigala*, *supra*, 191 Cal.App.4th at pp. 700-701 [holding same language in CALCRIM No. 1120 to be correct statement of law].) CALCRIM No. 1110 does not improperly negate a statutory element of section 288.

Defendant's reliance on *People v. Cuellar* (2012) 208 Cal.App.4th 1067 is unavailing. *Cuellar* concerned the identical language in CALCRIM No. 1120. The court in *Cuellar* did not conclude the instruction was infirm, constitutionally or otherwise. *Cuellar* stated the language is "possibly confusing" (*Cuellar,* at p. 1071), but, reading the instructions as a whole and given the overwhelming evidence against the defendant, the language did not mislead the jury. (*Id*. at p. 1072.) Subsequent to *Cuellar*, and effective February 26, 2013, the Advisory Committee on Criminal Jury Instructions deleted the sentence from the form jury instructions for both CALCRIM No. 1110 and No. 1120.

The revision to CALCRIM No. 1110 does not alter our assessment of the validity of CALCRIM No. 1110 as given below. There has been no change in the well-

10

established law that a violation of section 288 does not require an explicitly sexual touching. We reject defendant's argument the instruction was likely confusing to the jury when applied to count 7 regarding M.A. because that count did not involve conduct that was "explicitly sexual." M.A. testified defendant lured her into his room alone with him, on the pretext that he wanted her to look at a problem on his computer, sat her on the bed, then sat behind her, placing his arms around her in an embrace, and began to rub his hands up and down her inner thighs, telling her that her hair smelled nice. In our view, this behavior was explicitly sexual, and the jury no doubt found the behavior was explicitly sexual. Defendant has not persuaded us the instruction misled the jury.

Nor are we persuaded by defendant's argument that CALCRIM No. 1110 is argumentative or unfairly biased in favor of the prosecution because of inclusion of the following sentence: "Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required." Defendant contends the language is not only argumentative and biased, but also improperly suggests to the jury that such evidence should be given no weight at all. None of defendant's arguments have merit.

Once again, the challenged language is a correct statement of the law. Actual sexual arousal is *not* an element of the offense. (*People v. McCurdy* (1923) 60 Cal.App. 499, 502; see also 2 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Sex Offenses and Crimes Against Decency, § 53, p. 453 ["whether passions are actually aroused or gratified is of no consequence except as it may support the inference of intent"].) Section 288, subdivision (a) only requires the touching of the child be performed with the *intent* of arousing, appealing or gratifying the sexual desires of the perpetrator or the child. Whether the touching actually accomplishes the desired result is immaterial.

### c.    Reasonable and good faith belief in consent defense

Defendant argues the trial court erred by failing to instruct sua sponte on the defense of a reasonable and good faith belief in consent with respect to count 4, aggravated sexual assault of L.S., based on sexual penetration in violation of section 289, subdivision (a). We reject this claim.

11

In *People v. Soto* (2011) 51 Cal.4th 229 (*Soto*), the Supreme Court held that "consent is not a defense to the crime of lewd acts on a child under age 14 under any circumstances." (*Id*. at p. 233.) *Soto* concerned the crime of aggravated lewd act on a child pursuant to section 288, subdivision (b). The court explained the legislative history of the statute, and emphasized that lack of consent by a child victim is not an element of any offense under section 288. "When the Legislature amended section 288(b) in 1981 to delete the previous requirement that lewd acts committed by use of force, violence, duress, menace, or fear be 'against the will of the victim,' it effectively removed the concept of consent from child molestation cases." (*Soto,* at p. 245.)

Defendant argues that, unlike section 288, the crime of forcible sexual penetration against a minor under the age of 14 (§ 289, subd. (a)(1)(B)), which is in turn a crime of aggravated sexual assault on a child pursuant to section 269, subdivision (a)(5), does have as an element that the forcible sexual penetration be "accomplished against the victim's will." Defendant thus urges us to find that, consistent with the rationale of *Soto*, consent remains a valid defense to a section 289 charge.

However, assuming for the sake of argument the defense would apply to a charge under section 289 involving a minor victim under the age of 14, defendant has failed to show any error by the court in not instructing the jury on the defense. The court's sua sponte duty to instruct on a particular defense arises *only* where there is substantial evidence supporting the defense, and there was no such evidence here.

"'"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This includes the obligation to instruct "on recognized 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.' [Citation.]" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 334.)

12

The court's sua sponte duty to instruct on a defense is much narrower than its duty to instruct on lesser included offenses. (*People v. Barton* (1995) 12 Cal.4th 186, 195.) As to any particular defense, "a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*Breverman*, *supra*, 19 Cal.4th at p. 157.) The different standard reflects the fact that different considerations are at play as to defenses not raised by the defendant. "[T]o require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant." (*Barton*, *supra*, at p. 197.)

The record unequivocally establishes defendant did not raise a defense to count 4 based on a reasonable belief in consent by L.S. Defendant agreed with the court's deletion of some of the optional bracketed portions of CALCRIM No. 1045, including the language regarding a reasonable belief in consent defense. Defendant did not make an argument based on L.S.'s consent, and did not present evidence consistent with consent. Indeed, defendant's defense throughout trial was directed to the credibility of the victims, the lack of physical evidence showing that defendant committed the charged crimes, and that Detective Oseguera tricked defendant into confessing during the October 2010 and January 2011 interviews. Defense counsel argued in closing that the evidence was consistent with defendant's innocence and that the incidents of sexual abuse were simply made up.

More importantly, there was no evidence, let alone substantial evidence, supporting a reasonable belief in consent defense. L.S. testified unequivocally defendant's conduct was unwelcome and scared her. Defendant admitted that what L.S. told Detective Oseguera was the truth, and that he was the adult and should have stopped but did not. The Supreme Court has explained that substantial evidence warranting a consent instruction means "evidence sufficient to 'deserve consideration by the jury,' not 'whenever *any* evidence is presented, no matter how weak.'" (*People v. Williams* (1992)

13

4 Cal.4th 354, 361.) Defendant has not cited to any evidence of equivocal conduct by L.S. indicative of consent, or any substantial evidentiary basis giving rise to a sua sponte duty to instruct on the defense of reasonable and good faith belief in consent.

### d. CALCRIM No. 1191

Defendant contends the modified version of CALCRIM No. 1191 given to the jury was constitutionally infirm because it suggested to the jury the prosecutor did in fact present evidence that the specified crimes were actually committed by defendant, and impermissibly shifted the burden of proof in favor of guilt. We are not persuaded.

The jury was instructed as follows: "*The People presented evidence that the defendant committed the crimes of* Aggravated Sexual Assault of a Child under Fourteen and Ten or More Years Younger that [*sic*] the Defendant; Lewd or Lascivious Act on a Child Under Fourteen; Continuous Sexual Abuse; and Sending Harmful Matter. These crimes are defined for you in these instructions. [¶] If you decide beyond a reasonable doubt that the defendant committed a charged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to have the requisite specific intent for other charged crimes, and based on that decision also conclude that the defendant was likely to and did have the requisite specific intent for other charged offenses. If you conclude that the defendant committed a charged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the other charged offense. The People must still prove each element of every charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the specific intent of the defendant in certain charged offenses." We have italicized the portion of the instruction of which defendant complains.

The Supreme Court has held this type of instruction for propensity evidence arising from charged offenses is proper. (See *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*).) The defendant there was charged with raping five different victims. Like the jury here, the jury in *Villatoro* was instructed with a modified version of CALCRIM No. 1191 containing substantially similar language to the instruction here.

14

The instruction given in *Villatoro* read: "'The People presented evidence that the defendant committed the crime of rape as alleged in counts 2, 4, 7, 9, 12 and 15 and the crime of sodomy as alleged in count 14. These crimes are defined for you in the instructions for these crimes. [¶] If you decide that the defendant committed one of these charged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit the other charged crimes of rape or sodomy, and based on that decision also conclude that the defendant was likely to and did commit the other offenses of rape and sodomy charged. If you conclude that the defendant committed a charged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove the defendant is guilty of another charged offense. The People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.'" (*Villatoro*, *supra*, 54 Cal.4th at p. 1167.)

The Supreme Court expressed no concern about the preamble sentence which stated the prosecution had presented evidence the defendant had committed the crime of rape in the five identified counts—the identical language used in the preamble sentence here. The court then explained the modified instruction "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity. Thus, there was no risk the jury would apply an impermissibly low standard of proof." (*Villatoro*, *supra*, 54 Cal.4th at p. 1168.) When combined and read as a whole with the balance of the instructions, including CALCRIM No. 220, the modified instruction did not impermissibly shift the burden of proof or otherwise mislead the jury. (*Villatoro,* at p. 1168.)

Under *Villatoro*, the modified version of CALCRIM No. 1191 given to the jury here was proper. The instruction actually included additional language, not contained in the *Villatoro* instruction, emphasizing the beyond a reasonable doubt standard of proof. And, the jury instructions as a whole, including CALCRIM No. 220, also properly instructed the jury as to the prosecution's burden of proof, that defendant was presumed

15

innocent, and the fact that charges were filed against defendant was not evidence the charges were true.

Defendant's reliance on *People v. Owens* (1994) 27 Cal.App.4th 1155 is misplaced. *Owens* involved a different instruction (CALJIC No. 10.42.6) which included language that the "People have introduced evidence 'tending to prove'" there were more than three acts of lewd and lascivious conduct on which to base a conviction for continuous sexual abuse of a child. (*Owens*, at pp. 1158-1159.) While the court there found such language did have the potential to mislead and would have been better phrased to state the prosecution had introduced evidence "for the purpose of showing" rather than "tending to prove," it nonetheless did not conclude the instruction was improper. (*Ibid.*) The court explained that reading the instructions as a whole, including other instructions which plainly told the jury the prosecution bore the burden of proof beyond a reasonable doubt, it was not reasonably likely the instruction misled the jury. "[W]hether an erroneous or inartfully phrased instruction misled the jury to the defendant's prejudice is determined by reviewing the instructions as a whole." (*Id.* at p. 1159.) Nothing in *Owens* supports a conclusion the instruction here was infirm, constitutionally or otherwise.

## 2. The Motion to Suppress Was Properly Denied

Defendant contends the trial court erred in denying his motion to suppress his October 2010 pre-arrest statement to police officers, as well as any admissions from the January 2011 interview which were derivative of the first interview. We find no error in the court's denial of the motion to suppress.

Our Supreme Court has explained the well-established principles of law regarding the admissibility of a defendant's confession. "The basic law is settled. A criminal conviction may not be founded upon an involuntary confession. [Citation.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, '"[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.'" [Citation.] *Whether the*

16

*confession was voluntary depends upon the totality of the circumstances*. [Citations.] "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.'" [Citation.]' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 436 (*Williams*), italics added.)

While a promise of leniency may be a factor in determining voluntariness, the court emphasized the totality of circumstances approach. "In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an "'essentially free and unconstrained choice'" or whether the defendant's "'will has been overborne and his capacity for self-determination critically impaired'" by coercion. [Citation.] Relevant considerations are "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" [Citation.] [¶] 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' [Citation.] [¶] A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related." (*Williams*, *supra*, 49 Cal.4th at pp. 436-437.)

There is no basis to conclude Detective Oseguera's efforts to appeal to defendant's sense of family rose to the level of a psychological ploy that was so coercive in effect as to overcome defendant's will and produce an unreliable statement.

Neither interview was unduly long. At the initial October 4, 2010 pre-arrest interview, defendant voluntarily came to the police station to speak with Detective Oseguera. Defendant was not under arrest, and was free to leave at any time. There is nothing in the record indicating defendant suffered from any mental or physical disabilities. Defendant had been educated in Mexico, and had studied psychology.

While Detective Oseguera was still asking background questions, defendant volunteered his desire to make things right with his wife and family, a theme Detective

Oseguera then used during the balance of the interview to encourage defendant to continue to cooperate. Detective Oseguera did mention several times that the victims just wanted an apology and did not want to press charges, but defendant nonetheless largely maintained his version of events, denying a portion of the victims' accounts.

At the beginning of the January 21, 2011 interview, Detective Oseguera read defendant his *Miranda* rights, and defendant signed a written waiver. Defendant admitted again to some of the alleged conduct, and repeatedly expressed remorse, stating he had "to fix this no matter what; I have to set it right" with the family. He also told Detective Oseguera that he hesitated to explain everything from the beginning because it was embarrassing to admit to such things, not because he was fearful.

There was no express or implied promise of leniency. In our view, judging the totality of the circumstances as instructed by *Williams*, there was no coercive conduct by Detective Osequera that resulted in defendant's will having been ""'"overborne and his capacity for self-determination critically impaired."'"" (*Williams*, *supra*, 49 Cal.4th at p. 436.) Accordingly, the trial court did not err in finding defendant's statements to be voluntary.

### 3. The Restitution Fine

Finally, defendant argues the imposition of a restitution fine in the amount of $1,000 constituted error of constitutional magnitude, and must be reduced to the statutory minimum of $200.[5] Respondent contends the claim has been forfeited by failure to object at the time of sentencing, but that, in any event, the fine was properly imposed in an amount within the court's discretion and within the statutory range.

Section 1202.4, subdivision (b) provides, in relevant part, as follows: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not

---

[5] Defendant incorrectly states the statutory minimum as $200. The sentencing here took place in May 2012 and therefore the statutory minimum for a felony conviction was $240. (§ 1202.4, subd. (b).)

18

doing so and states those reasons on the record.  [¶]  (1)  The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense.  If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012 . . . and not more than ten thousand dollars ($10,000). . . .  [¶]  (2)  In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted.”

At the sentencing hearing, the court ordered:  “Pursuant to the provisions of . . . section 1202.4, the defendant is ordered to pay a restitution fine to the state restitution fund in the amount of $1,000.  The Department of Corrections may collect this restitution from the defendant’s earnings, if any, while in prison.”  Defendant did not raise any objections or assert any alleged impropriety in the imposition of the statutorily mandated restitution fine.  The court then completed the balance of its sentencing order.

Defendant forfeited his claim of error by failing to raise any objection in the trial court.  (*People v. Scott* (1994) 9 Cal.4th 331, 351-353.)  However, even assuming the claim of error was properly preserved, it has no merit.  Defendant, relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), argues he had a Sixth Amendment right to have the jury determine all necessary facts upon which the fine was based, such as defendant’s ability to pay.

In *Southern Union Co. v. United States* (2012) __ U.S. __ [132 S.Ct. 2344] (*Southern Union*), the United States Supreme Court held the rule of *Apprendi*, that the “Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant’s maximum potential sentence,” also applies to the imposition of criminal fines.  (*Southern Union*, at pp. 2348-2349, 2357.)  “The ‘“statutory maximum” for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.’  [Citation.]”  (*Id*. at p. 2350.)

19

In *Southern Union*, the defendant was charged with violating the Resource Conservation and Recovery Act. The relevant penalty provision of the Act provided for the imposition of a fine of $50,000 for each day a defendant was found to be in violation. (*Southern Union*, *supra*, 132 S.Ct. at p. 2349.) Therefore, the maximum amount of the fine was tied to the determination of specified facts, namely the number of days the government could prove the defendant was in violation of the Act. Accordingly, the Supreme Court explained that *Apprendi* applied to require a jury determination as to those underlying facts necessary to fix the appropriate amount of the statutory penalty. (*Southern Union*, at pp. 2353-2356.)

In contrast, section 1202.4 provides that a restitution fine payable to the state restitution fund *shall* be imposed upon conviction of a felony. The statute sets forth an express monetary range, vesting discretion in the trial court to determine an appropriate amount within the statutory range. The maximum amount of the fine is fixed by statute, and the appropriateness of fixing the amount is not pegged to any facts which the jury must decide. Indeed, a restitution fine in a felony case, as here, may be calculated simply by multiplying the statutory minimum amount by the number of years sentenced and the number of counts on which the defendant was convicted. The court here chose an amount only slightly above the statutory minimum, well within the statutory range, and far below an amount reflective of using the multiplier based on the length of the sentence and the number of relevant counts. The Supreme Court has stated the exercise of such sentencing discretion is "fully consistent with *Apprendi*, which permits courts to impose 'judgment *within the range* prescribed by statute.' [Citation.]" (*Southern Union*, *supra*, 132 S.Ct. at p. 2353.) Defendant has failed to show any impropriety in the trial court's imposition of the $1,000 restitution fine.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.