Justice Sotomayor
delivered the opinion of the Court.
The Sixth Amendment reserves to juries the determination of any fact, other than the fact of a prior conviction, that increases a criminal defendant’s maximum potential sentence. Apprendi v. New Jersey, 530 U. S. 466 (2000); Blakely v. Washington, 542 U. S. 296 (2004). We have applied this principle in numerous cases where the sentence was imprisonment or death. The question here is whether the same rule applies to sentences of criminal fines. We hold that it does.
I
Petitioner Southern Union Company is a natural gas distributor. Its subsidiary stored liquid mercury, a hazardous substance, at a facility in Pawtucket, Rhode Island. In September 2004, youths from a nearby apartment complex broke into the facility, played with the mercury, and spread it around the facility and complex. The complex’s residents were temporarily displaced during the cleanup and most underwent testing for mercury poisoning.
In 2007, a grand jury indicted Southern Union on multiple counts of violating federal environmental statutes. As relevant here, the first count alleged that the company knowingly stored liquid mercury without a permit at the Paw-tucket facility “[fjrom on or about September 19, 2002 until on or about October 19, 2004,” App. 104, in violation of the Resource Conservation and Recovery Act of 1976 (RCRA), see 90 Stat. 2812, as amended, 42 U. S. C. § 6928(d)(2)(A). A jury convicted Southern Union on this count following a trial in the District Court for the District of Rhode Island. The *347 verdict form stated that Southern Union was guilty of unlawfully storing liquid mercury “on or about September 19, 2002 to October 19, 2004.” App. 140.
Violations of the RCRA are punishable by, inter alia, “a fine of not more than $50,000 for each day of violation.” 16928(d). At sentencing, the probation office set a maximum fine of $38.1 million, on the basis that Southern Union violated the RCRA for each of the 762 days from September 19, 2002, through October 19, 2004. Southern Union objected that this calculation violated A-pprendi because the jury was not asked to determine the precise duration of the violation. The company noted that the verdict form listed only the violation’s approximate start date (i. e., “on or about”), and argued that the court’s instructions permitted conviction if the jury found even a 1-day violation. Therefore, Southern Union maintained, the only violation the jury necessarily found was for one day, and imposing any fine greater than the single-day penalty of $50,000 would require factfinding by the court, in contravention of Apprendi.
The Government acknowledged the jury was not asked to specify the duration of the violation, but argued that Ap-prendi does not apply to criminal fines. The District Court disagreed and held that Apprendi applies. But the court concluded from the “content and context of the verdict all together” that the jury found a 762-day violation. App. to Pet. for Cert. 46a. The court therefore set a maximum potential fine of $38.1 million, from which it imposed a fine of $6 million and a “community service obligatio[n]” of $12 million. App. 154.
On appeal, the United States Court of Appeals for the First Circuit rejected the District Court’s conclusion that the jury necessarily found a violation of 762 days. 630 F. 3d 17, 36 (2010). But the Court of Appeals affirmed the sentence because it also held, again in contrast to the District Court, that Apprendi does not apply to criminal fines. 630 F. 3d, at 33-36. Other Circuits have reached the opposite conclusion. *348 See United States v. Pfaff, 619 F. 3d 172 (CA2 2010) (per cu-riarn); United States v. LaGrou Distribution Sys., Inc., 466 F. 3d 585 (CA7 2006). We granted certiorari to resolve the conflict, 565 U. S. 1057 (2011), and now reverse.
II
A
This case requires us to consider the scope of the Sixth Amendment right of jury trial, as construed in Apprendi. Under Apprendi, “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” 530 U. S., at 490. The “‘statutory maximum’ for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.” Blakely, 542 U. S., at 303 (emphasis deleted). Thus, while judges may exercise discretion in sentencing, they may not “inflic[t] punishment that the jury’s verdict alone does not allow.” Id., at 304.
Apprendi’& rule is “rooted in longstanding common-law practice.” Cunningham v. California, 549 U. S. 270, 281 (2007). It preserves the “historic jury function” of “determining whether the prosecution has proved each element of an offense beyond a reasonable doubt.” Oregon v. Ice, 555 U. S. 160, 163 (2009). We have repeatedly affirmed this rule by applying it to a variety of sentencing schemes that allowed judges to find facts that increased a defendant’s maximum authorized sentence. See Cunningham, 549 U. S., at 274-275 (elevated “upper term” of imprisonment); United States v. Booker, 543 U. S. 220, 226-227, 233-234 (2005) (increased imprisonment range for defendant under then-mandatory Federal Sentencing Guidelines); Blakely, 542 U. S., at 299-300 (increased imprisonment above statutorily prescribed “standard range”); Ring v. Arizona, 536 U. S. 584, 588-589 (2002) (death penalty authorized upon finding exist *349 ence of aggravating factors); Apprendi, 530 U. S., at 468-469 (extended term of imprisonment based on violation of a “hate crime” statute).
. While the punishments at stake in those cases were imprisonment or a death sentence, we see no principled basis under Apprendi for treating criminal fines differently. Ap-prendi'“core concern” is to reserve to the jury “the determination of facts that warrant punishment for a specific statutory offense.” Ice, 555 U. S., at 170. That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses. Fines were by far the most common form of noncapital punishment in colonial America.[1] They are frequently imposed today, especially upon organizational defendants who cannot be imprisoned.[2] And the amount of a fine, like the maximum term of imprisonment or eligibility for the death penalty, is often calculated by reference to particular facts. Sometimes, as here, the fact is the duration of a statutory violation;[3] under other statutes it is the amount *350 of the defendant’s gain or the victim’s loss, or some other factor.[4] In all such cases, requiring juries to find beyond a reasonable doubt facts that determine the fine’s maximum amount is necessary to implement Apprendi’s “animating principle”: the “preservation of the jury’s historic role as a bulwark between the State and the accused at the trial for an alleged offense.” Ice, 555 U. S., at 168. In stating Apprendi’s rule, we have never distinguished one form of punishment from another. Instead, our decisions broadly prohibit judicial factfinding that increases maximum criminal “sentenced],” “penalties,” or “punishment[s]”—terms that each undeniably embrace fines. E. g., Blakely, 542 U. S., at 304; Apprendi, 530 U. S., at 490; Ring, 536 U. S., at 589.
The Government objects, however, that fines are less onerous than incarceration and the death sentence. The Government notes that Apprendi itself referred to the physical deprivation of liberty that imprisonment occasions, see 530 U. S., at 484, and that we have placed more weight on imprisonment than on fines when construing the scope of the Sixth Amendment rights to counsel and jury trial. See Blanton v. North Las Vegas, 489 U. S. 538, 542-543 (1989) (jury trial); Scott v. Illinois, 440 U. S. 367, 373-374 (1979) (counsel). Therefore, the Government concludes, fines categorically “do not implicate” the “primary concerns motivating Apprendi.” Brief for United States 23-25.
This argument fails because its conclusion does not follow from its premise. Where a fine is so insubstantial that the underlying offense is considered “petty,” the Sixth Amendment right of jury trial is not triggered, and no Apprendi issue arises. See, e. g., Muniz v. Hoffman, 422 U. S. 454, 477 *351 (1975) ($10,000 fine imposed on labor union does not entitle union to jury trial); see also Blanton, 489 U. S., at 541 (no jury trial right for “petty” offenses, as measured by the “severity of the maximum authorized penalty” (internal quotation marks omitted)). The same, of course, is true of offenses punishable by relatively brief terms of imprisonment—these, too, do not entitle a defendant to a jury trial. See id., at 543 (establishing a rebuttable presumption that offenses punishable by six months’ imprisonment or less are petty); Duncan v. Louisiana, 391 U. S. 145, 159-162 (1968).
But not all fines are insubstantial, and not all offenses punishable by fines are petty. See, e. g., Mine Workers v. Bagwell, 512 U. S. 821, 838, n. 5 (1994) (criminal contempt fine of $52 million imposed on union “unquestionably is a serious contempt sanction” that triggers right of jury trial). The federal twice-the-gain-or-loss statute, in particular, see 18 U. S. C. § 3571(d), has been used to obtain substantial judgments against organizational defendants. See, e. g., Amended Judgment in United States v. LG Display Co., Ltd., No. 08-CR-803-SI (ND Cal.), pp. 1-2 ($400 million fine for conviction of single count of violating Sherman Antitrust Act); Judgment in United States v. Siemens Aktiengesellschaft, No. 08-CR-367-RJL (D DC), pp. 1-2, 5 ($448.5 million fine for two violations of Foreign Corrupt Practices Act); United States Sentencing Commission, 2010 Annual Report, ch. 5, p. 38 (noting fine of $1,195 billion imposed on pharmaceutical corporation for violations of food and drug laws). And, where the defendant is an individual, a large fine may “engender ‘a significant infringement of personal freedom.’ ” Blanton, 489 U. S., at 542 (quoting Frank v. United States, 395 U. S. 147, 151 (1969)); see also 18 U. S. C. § 3572(a)(2) (requiring court to consider “the burden that the fine will impose upon the defendant” in determining whether to impose a fine and in what amount).
The Government thus asks the wrong question by comparing the severity of criminal fines to that of other punish *352 ments. So far as Apprendi is concerned, the relevant question is the significance of the fine from the perspective of the Sixth Amendment’s jury trial guarantee. Where a fine is substantial enough to trigger that right, Apprendi applies in full. As we said in Cunningham, “Asking whether a defendant’s basic jury-trial right is preserved, though some facts essential to punishment are reserved for determination by the judge,... is the very inquiry Apprendi’s ‘bright-line rule’ was designed to exclude.” 549 U. S., at 291.
This case is exemplary. The RCRA subjects Southern Union to a maximum fine of $50,000 for each day of violation. 42 U. S. C. § 6928(d). The Government does not deny that, in light of the seriousness of that punishment, the company was properly accorded a jury trial. And the Government now concedes the District Court made factual findings that increased both the “potential and actual” fine the court imposed. Brief for United States 28. This is exactly what Apprendi guards against: judicial factfinding that enlarges the maximum punishment a defendant faces beyond what the jury’s verdict or the defendant’s admissions allow.
B
In concluding that the rule of Apprendi does not apply to criminal fines, the Court of Appeals relied on our decision in Ice. Ice addressed the question whether, when a defendant is convicted of multiple offenses, Apprendi forbids judges to determine facts that authorize the imposition of consecutive sentences. 555 U. S., at 164. In holding that Apprendi does not, Ice emphasized that juries historically played no role in deciding whether sentences should run consecutively or concurrently. See 555 U. S., at 168-169. The Court of Appeals reasoned that juries were similarly uninvolved in setting criminal fines. 630 F. 3d, at 35.[5]
*353 The Court of Appeals was correct to examine the historical record, because “the scope of the constitutional jury right must be informed by the historical role of the jury at common law.” Ice, 555 U. S., at 170. See also, e. g., Blakely, 542 U. S., at 301-302; Apprendi, 530 U. S., at 477-484. But in our view, the record supports applying Apprendi to criminal fines. To be sure, judges in the Colonies and during the founding era “possessed a great deal of discretion” in determining whether to impose a fine and in what amount. Lillquist 640-641; see also Preyer 350. Often, a fine’s range “was apparently without limit except insofar as it was within the expectation on the part of the court that it would be paid.” Ibid. For some other offenses, the maximum fine was capped by statute. See, e. g., id., at 333 (robbery, larceny, burglary, and other offenses punishable in Massachusetts Bay Colony “by fines of up to £5”); Act of Feb. 28, 1803, ch. 9, § 7, 2 Stat. 205 (any consul who gives a false certificate shall “forfeit and pay a fine not exceeding ten thousand dollars, at the discretion of the court”); K. Stith & J. Cabranes, Fear of Judging: Sentencing Guidelines in the Federal Courts 9 (1998) (describing federal practice).
The exercise of such sentencing discretion is fully consistent with Apprendi, which permits courts to impose “judgment within the range prescribed by statute.” 530 U. S., at 481 (emphasis in original). Nor, a fortiori, could there be an Apprendi violation where no maximum is prescribed. Indeed, in surveying the historical record that formed the basis of our holding in Apprendi, we specifically considered *354 the English practice with respect to fines, which, as was true of many colonial offenses, made sentencing largely “dependent upon judicial discretion.” See id., at 480, n. 7; see also Jones v. United States, 526 U. S. 227, 244-245 (1999); 4 W. Blaekstone, Commentaries on the Laws of England 372-378 (1769) (hereinafter Blaekstone). And even then, as the dissent acknowledges, post, at 370-371 (opinion of Breyer, J.), there is authority suggesting that English juries were required to find facts that determined the authorized pecuniary punishment. See 1 T. Starkie, A Treatise on Criminal Pleading 187-188 (1814) (In cases “where the offence, or its defined measure of punishment, depends upon” property’s specific value, the value “must be proved precisely as it is laid [in the indictment], and any variance will be fatal”); see also id., at 188 (“[I]n the case of usury, where the judgment depends upon the quantum taken, the usurious contract must be averred according to the fact; and a variance from it, in evidence, would be fatal, because the penalty is apportioned to the value” (emphasis in original)); 2 W. Hawkins, A Treatise of the Pleas of the Crown, ch. 25, § 75, pp. 234-235 (3d ed. 1739) (doubting whether “it be needful to set forth the Value of the Goods in an Indictment of Trespass for any other Purpose than to aggravate the Fine”).
In any event, the salient question here is what role the jury played in prosecutions for offenses that did peg the amount of a fine to the determination of specified facts— often, the value of damaged or stolen property. See Apprendi, 530 U. S., at 502, n. 2 (Thomas, J., concurring). Our review of state and federal decisions discloses that the predominant practice was for such facts to be alleged in the indictment and proved to the jury. See, e. g., Commonwealth v. Smith, 1 Mass. 245, 247 (1804) (declining to award judgment of treble damages for all stolen items in larceny prosecution when indictment alleged value of only some of the items); Clark v. People, 2 Ill. 117, 120-121 (1833) (arson indictment must allege value of destroyed building because *355 statute imposed “a fine equal in value to the property burned”); State v. Garner, 8 Port. 447, 448 (Ala. 1839) (same in malicious mischief prosecution where punishment was fine “not exceeding four fold the value of the property injured or destroyed”); Ritchey v. State, 7 Blackf. 168, 169 (Ind. 1844) (same in arson prosecution because, “[i]n addition to imprisonment in the penitentiary, the guilty person is liable to a fine not exceeding double the value of the property destroyed”); Hope v. Commonwealth, 50 Mass. 134, 137 (1845) (the “value of the property alleged to be stolen must be set forth in the indictment” in part because “[o]ur statutes . . . prescribe the punishment for larceny, with reference to the value of the property stolen”); State v. Goodrich, 46 N. H. 186, 188 (1865) (“It may also be suggested, that, in the case of simple larceny, the respondent may be sentenced to pay the owner of the goods stolen, treble the value thereof, which is an additional reason for requiring the [value of the .stolen items] to be stated [in the indictment]”); United States v. Woodruff, 68 F. 536, 538 (Kan. 1895) (“[T]he defendant is entitled to his constitutional right of trial by jury” to ascertain “the exact sum for which a fine may be imposed”).[6]
*356 The rule that juries must determine facts that set a fine’s maximum amount is an application of the “two longstanding tenets of common-law criminal jurisprudence” on which Apprendi is based: First, “the 'truth of every accusation’ against a defendant 'should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours.’ ” Blakely, 542 U. S., at 301 (quoting 4 Blackstone 343). And second, “ ‘an accusation which lacks any particular fact which the law makes essential to the punishment is ... no accusation within the requirements of the common law, and it is no accusation in reason.’” 542 U. S., at 301-302 (quoting 1 J. Bishop, Criminal Procedure § 87, p. 55 (2d ed. 1872)). Indeed, Bishop’s leading treatise on criminal procedure specifically identified cases involving fines as evidence of the proposition that “the indictment must, in order to inform the court what punishment to inflict, contain an averment of every particular thing which enters into the punishment.” Id., § 540, at 330 (discussing Clark and Garner). This principle, Bishop explained, “pervades the entire system of the adjudged law of criminal procedure. It is not made apparent to our understandings by a single case only, but by all the cases.” Criminal Procedure § 81, at 51. See also Apprendi, 530 U. S., at 510-511 (Thomas, J., concurring) (explaining that Bishop grounded this principle in “well-established common-law practice . . . and in the provisions of Federal and State Constitutions guaranteeing notice of an accusation in all criminal cases, indictment by a grand jury for serious crimes, and trial by jury”).
As counterevidence that juries historically did not determine facts relevant to criminal fines, the Government points *357 to two decisions from this Court. One is United States v. Murphy, 16 Pet. 203 (1842), which considered whether an interested witness was competent to testify in a larceny .prosecution brought under a provision of the Crimes Act of 1790. Murphy’s only relevance to this case is that the Crimes Act authorized a fine of up to four times the value of the stolen property, and the Court remarked that “the fine is, as to its amount, purely in the discretion of the Court.” Id., at 209. But this statement is best read as permitting the court to select a fine from within the maximum authorized by jury-found facts—a practice, as noted, that accords with Apprendi. Such a reading is consistent with the fact that the indictment in Murphy alleged the value of the stolen items, see 16 Pet., at 207-208, and with the practice of contemporary courts addressing the same statute, see United States v. Holland, 26 F. Cas. 343, 345 (No. 15,378) (CC SDNY 1843) (trial court instructs jury “to assess the value of the property taken” in order to determine maximum fine); Pye v. United States, 20 F. Cas. 99 (No. 11,488) (CC DC 1842) (value of stolen items alleged in indictment).
The Government and dissent place greater reliance on United States v. Tyler, 7 Cranch 285 (1812). But like Murphy, this decision involved no constitutional question. Rather, it construed a federal embargo statute that imposed a fine of four times the valúe of the property intended to be exported. The indictment identified the property at issue as “pearl-ashes,” but the jury’s guilty verdict referred instead to “‘pot-ashes [that] were worth two hundred and eighty dollars.’” Tyler, 7 Cranch, at 285.[7] The question was whether the discrepancy rendered the verdict “not suf *358 ficiently certain as to the value of the property charged in the indictment,” i. e., pearl-ashes. Ibid. The Court held that the discrepancy was immaterial, on the ground that “under this law, no valuation by the jury was necessary to enable the Circuit Court to impose the proper fine.” Ibid. The Court’s reasoning is somewhat opaque, but appears to rest on the text of the embargo statute, which directed that the defendant “shall, upon conviction, be . . . fined a sum by the Court.” Ibid. In any event, nothing in the decision purports to construe the Sixth Amendment. And, insofar as Tyler reflects prevailing practice, it bears noting that both the indictment and verdict identified the value of the property at issue. See Tr. 2 in Tyler, 7 Cranch 285, reprinted in Appellate Case Files of the Supreme Court of the United States, 1792-1831, National Archives Microfilm Publications No. 214 (1962), roll 18 (indictment: “nineteen barrels of pearl-ashes, which were then and there of the value of six hundred dollars”). Whatever the precise meaning of this decision, it does not outweigh the ample historical evidence showing that juries routinely found facts that set the maximum amounts of fines.
Ill
The Government’s remaining arguments, echoed by the dissent (see post, at 381-386), are unpersuasive. The Government first submits that, when it comes to fines, “the judicially found facts typically involve only quantifying the harm caused by the defendant’s offense”—for example, how long did the violation last, or how much money did the defendant gain (or the victim lose)?—“as opposed to defining a separate set of acts for punishment.” Brief for United States 25. Only the latter determination, the Government contends, implicates Apprendi’s concerns.
This argument has two defects. First, it rests on an assumption that Apprendi and its progeny have uniformly rejected: that in determining the maximum punishment for an offense, there is a constitutionally significant difference *359 between a fact that is an “element” of the offense and one that is a “sentencing factor.” See, e. g., 530 U. S., at 478; Ring, 536 U. S., at 605. Second, we doubt the coherence of this distinction. This case proves the point. Under 42 U. S. C. § 6928(d), the fact that will ultimately determine the maximum fine Southern Union faces is the number of days the company violated the statute. Such a finding is not fairly characterized as merely “quantifying the harm” Southern Union caused. Rather, it is a determination that for each given day, the Government has proved that Southern Union committed all of the acts constituting the offense.
The Government next contends that applying Apprendi to fines will prevent States and the Federal Government from enacting statutes that, like § 6928(d), calibrate fines to a defendant’s culpability, thus providing just punishment and reducing unwarranted sentencing disparity. But the Government presents a false choice. As was true in our prior Apprendi cases, and remains so here, legislatures are free to enact statutes that constrain judges’ discretion in sentencing—Apprendi requires only that such provisions be administered in conformance with the Sixth Amendment.
Last, the Government argues that requiring juries to determine facts related to fines will cause confusion (because expert testimony might be needed to guide the inquiry); or prejudice the defendant (who might have to deny violating a statute while simultaneously arguing that any violation was minimal); or be impractical (at least when the relevant facts are unknown or unknowable until the trial is completed).[8] These arguments rehearse those made by the dissents in *360 our prior Apprendi cases. See Booker, 543 U. S., at 329 (Breyer, J., dissenting in part); Blakely, 542 U. S., at 318-320 (O’Connor, J., dissenting); id., at 330-340 (Breyer, J., dissenting); Apprendi, 530 U. S., at 555-559 (same). Here, as there, they must be rejected. For even if these predictions are accurate, the rule the Government espouses is unconstitutional. That “should be the end of the matter.” Blakely, 542 U. S., at 313.
But here there is particular reason to doubt the strength of these policy concerns. Apprendi is now more than a decade old. The reliance interests that underlie many of the Government’s arguments are by this point attenuated. Nor, in our view, does applying Apprendi’s rule to criminal fines mark an unexpected extension of the doctrine. Most Circuits to have addressed the issue already embrace this position, see Pfaff, 619 F. 3d, at 175-176; LaGrou Distribution Sys., 466 F. 3d, at 594; United States v. Yang, 144 Fed. Appx. 521, 524 (CA6 2005), as did the Government prior to Ice, see Brief in Opposition 11, n. 2. In light of the reasons given in this opinion, the dramatic departure from precedent would be to hold criminal fines exempt from Apprendi.
* * *
We hold that the rule of Apprendi applies to the imposition of criminal fines. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 See Preyer, Penal Measures in the American Colonies: An Overview, 26 Am. J. Legal Hist. 326, 350 (1982) (hereinafter Preyer); see also Lill-quist, The Puzzling Return of Jury Sentencing: Misgivings About Apprendi, 82 N. C. L. Rev. 621, 640-641 (2004) (hereinafter Lillquist); Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc., 492 U. S. 257, 290 (1989) (O’Connor, J., concurring in part and dissenting in part) (fines were “the preferred penal sanction” in England by the 17th century). “Imprisonment,” in contrast, “although provided for as a punishment in some colonies, was not a central feature of criminal punishment until a later time.” Preyer 329; see also Lillquist 641-643.

 In 2011, a fine was imposed on 9% of individual defendants and on 70.6% of organizational defendants in the federal system. See United States Sentencing Commission, 2011 Annual Report, ch. 5, pp. 34, 40.

 See, e.g., 12 U.S.C. § 1467a(i)(1); 15 U.S.C. § 717t(b); 16 U.S.C. § 825o(b); Cal. Health & Safety Code Ann. § 25515(a) (West Supp. 2012); Colo. Rev. Stat. Ann. §§ 25-7-122.1(1)(b) and (e) (2011); Mass. Gen. Laws, ch. 21, § 34C (West 2010); N. J. Stat. Ann. § 13:1E-99.89(f) (West Supp. 2012).

 See, e. g., 18 U. S. C. § 3571(d) (fine “not more than the greater of twice the gross gain or twice the gross loss”); Fla. Stat. § 775.083(1)(f) (2010) (same); Tex. Parks & Wild. Code Ann. § 12.410(c) (West 2002) (same); see also 18 U. S. C. § 645 (fine for embezzlement by officers of United States courts of up to twice the value of the money embezzled); § 201(b) (fine for bribery of public officials of up to three times the value of the bribe).

 Ice also stated in dicta that applying Apprendi to consecutive-versus-concurrent sentencing determinations might imperil a variety of sentencing decisions judges commonly make, including “the imposition of statuto *353 rily prescribed fines.” 555 U. S., at 171. The Court of Appeals read this statement to mean that Apprendi does not apply to criminal fines. 630 F. 3d, at 34. We think the statement is at most ambiguous, and more likely refers to the routine practice of judges’ imposing fines from within a range authorized by jury-found facts. Such a practice poses no problem under Apprendi because the penalty does not exceed what the jury’s verdict permits. See 530 U. S., at 481. In any event, our statement in Ice was unnecessary to the judgment and is not binding. Central Va. Community College v. Katz, 546 U. S. 356, 363 (2006).

 The dissent believes these decisions are inapposite because some of them arose in States that authorized juries, rather than judges, to impose sentence. See post, at 377-379. But this fact was not the basis of the decisions; rather, the courts required value to be alleged and proved to the jury because “the extent of the punishment . . . depend[s] upon the value of the property consumed or injured.” Ritchey, 7 Blackf., at 169; see also, e. g., Clark, 2 Ill., at 120-121 (same). And as Bishop explained, this requirement of proof originated not from a unique feature of jury sentencing, but from longstanding common-law principles—a point to which the dissent notably does not respond. 1 J. Bishop, Criminal Procedure §§ 81, 540 (2d ed. 1872). See infra, at 356.
Nor, for that matter, do larceny cases “presenft] a special circumstance.” Post, at 379. Such decisions invoked the same reasoning as the other cases just mentioned. See, e. g., Hope, 50 Mass., at 137 (value must be proved because, among other things, “[o]ur statutes ... prescribe the punishment for larceny ... with reference to the value of the property stolen”); Goodrich, 46 N. H., at 188 (same). Bishop made this point explicit: “[Value] *356 must be alleged wherever it is an element to be considered by the court in determining the punishment, and it is immaterial whether the particular crime is larceny or any other crime.” Criminal Procedure § 541, at 331 (emphasis added). At the end of the day, the only evidence the dissent musters that judges found fine-enhancing facts are United States v. Tyler, 7 Cranch 285 (1812), and one lower court decision restating Tyler’s holding. See post, at 374-376. We address Tyler below. See infra, at 357-358.

 We will not keep the reader in suspense: Pot-ash and pearl-ash are alkaline salts of differing causticity that “for a long time [were] amongst the most valuable articles of manufacture and commerce” in parts of early America. D. Townsend, Principles and Observations Applied to the Manufacture and Inspection of Pot and Pearl Ashes 3 (1793). See also Board of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc., 563 U. S. 776, 785 (2011).

 In this vein, the dissent speculates that today’s decision may “nudg[e] our [criminal justice] system” further in favor of plea bargains at the expense of jury trials. Post, at 386. But groups representing the interests of defendants—whom the dissent’s rule purportedly favors—tell us the opposite is true. See Brief for Chamber of Commerce of the United States of America et al. as Amici Curiae 5 (“[Exempting criminal fines from Apprendi makes innocent defendants more likely to plead guilty”).