Filed 3/28/14

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071233 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F05210) |
| v. | |
| ROBERT DURST, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Marjorie Koller, Judge. Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Robert Durst lit a candle and opened a gas valve in an empty house, which caused the house to explode when firefighters opened the front door. Convicted of arson and other crimes with enhancements for injuring the firefighters and sentenced to 17 years in state prison, defendant appeals.

1

On appeal, defendant contends the trial court erred by: (1) denying his motion to suppress his confession as involuntary, (2) excluding his expert testimony on false confessions, and (3) imposing booking and attorney fees without a jury determining his ability to pay and the actual costs to the county. Each contention is without merit.

Defendant forfeits his contention on appeal that his confession was involuntary because he fails to acknowledge the facts as found by the trial court in the suppression hearing, and, in any event, the contention is without merit because the evidence produced at the suppression hearing supports the trial court's determination that defendant was not in custody when he was first interviewed and admitted his involvement in the crime.

As to the contention that the trial court improperly excluded his proffered expert testimony on false confessions, the trial court properly exercised its discretion in excluding the evidence because there was minimal evidence indicating a false confession and overwhelming evidence that corroborated the confession.

The contentions concerning the booking and attorney fees are without merit because defendant did not object to those fees in the trial court. Also, defendant was not entitled to a jury trial on his ability to pay and the actual costs to the county.

FACTS AND PROCEDURE

Defendant lived in a house in Sacramento with his wife and his wife's two daughters. Next door was a rental house belonging to Christopher Liu. Defendant did not like Liu because of a dispute over payment for work defendant did for Liu on the rental. Defendant threatened that there would be consequences if Liu did not pay what defendant believed Liu owed him.

Late on the night of July 4, 2010, defendant was seen sitting on his front porch smoking a cigarette and drinking beer. He was again seen sitting on his front porch in the early morning hours of July 5, 2010. A strong smell of gas was emanating from Liu's rental property, which was empty at the time. The gas meter was spinning rapidly. A

2

neighbor mentioned the smell to defendant, who said that he would look into it. The neighbor also saw a glowing light through the window in the rental house.

Later in the morning, workers arrived to do some work on the rental house. They also smelled gas and noticed the gas meter spinning rapidly. A leasing agent arrived at the property, made the same observations, and called 911.

Firefighters arrived and turned off the gas. When they forced open the front door to ventilate the house, the house exploded. Three firefighters were severely injured in the blast, while another sustained less serious injuries.

A candle with candy sprinkles in it, which had been in defendant's house, was found in the rental house and was identified as the source of ignition. Defendant's stepdaughter and her friend had put candy sprinkles in some candles. The gas valve for the stove in the rental house had been left open.

Two weeks after the explosion, defendant was interviewed by detectives. He admitted that he had stolen items from the rental house, including copper, a water heater, and a ceiling fan. After several hours of questioning, defendant admitted that he took the candle to the rental house, lit it, opened the gas valve for the stove, and left the house. Defendant was allowed to leave the police station in a taxi, but shortly after that he was arrested and booked.

The next day, at the jail, defendant again admitted his role in the house explosion.

A jury convicted defendant of arson causing great bodily injury (Pen. Code, § 451, subd. (a)), possession of a firearm by a convicted felon (Pen. Code, former § 12021, subd. (a)(1)), two counts of second degree burglary (Pen. Code, § 459), and two counts of receiving stolen property (Pen. Code, § 496). The jury also found true allegations appended to the arson count that defendant caused great bodily injury to a firefighter (Pen. Code, § 451.1, subd. (a)(2)), caused great bodily injury to more than one person (Pen. Code, § 451.1, subd. (a)(3)), and used a device to accelerate the fire or delay ignition (Pen. Code, § 451.1, subd. (a)(5)).

3

The trial court sentenced defendant to an aggregate determinate term of 17 years in state prison.

## DISCUSSION

## I

### *Voluntariness of Confession*

At the preliminary hearing, defendant made a motion to suppress his confession made on July 20 at the jail. He argued that, even though the confession was made after he was advised of his *Miranda*[1] rights, it was involuntary because that confession was caused by defendant's confession the day before, on July 19, in an interview during which he was not advised of his *Miranda* rights. According to defendant, the detectives who interviewed him engaged in a deliberate two-step process of (1) interviewing him before advising him of his *Miranda* rights so that they could get him to confess, then (2) arresting him and having him repeat the confession. The trial court, Judge Greta Curtis Fall presiding, denied the motion to suppress. Before trial, defendant renewed the motion, which was denied by Judge Marjorie Koller. Specifically, the court concluded defendant was not in custody during the July 19 interview and that the July 20 confession was voluntary. It therefore allowed the prosecution to introduce the July 20 confession to the jury. The defense decided to introduce the July 19 confession to try to establish that the confessions were false confessions.

We conclude that, because defendant's opening brief fails to state the facts of the questioning in the light most favorable to the ruling, he forfeited the contention that the July 20 confession was involuntary. We also conclude that, even if the contention had not been forfeited, we would find there was no *Miranda* problem with the July 19 questioning because defendant was not in custody at the time.

---

[1]    *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

A. *Relevant Law*

Under *Miranda*, "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citation.] Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial. [Citations.] An officer's obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him "in custody." ' [Citations.] In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' [Citations.]" (*Stansbury v. California* (1994) 511 U.S. 318, 322 [128 L.Ed.2d 293, 298].)

"*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.]" (*People v. Moore* (2011) 51 Cal.4th 386, 402, italics omitted.) Also, using a ruse to elicit information has nothing to do with whether defendant was in custody for purposes of the *Miranda* rule. (*California v. Beheler* (1983) 463 U.S. 1121, 1123-1125 [77 L.Ed.2d 1275, 1278-1279]; *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [50 L.Ed.2d 714, 719].)

Citing *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643] (*Seibert*), defendant contends that the detectives who questioned him engaged in a practice that rendered involuntary his confession on July 20. In *Seibert*, Patrice Seibert's 12-year-old son Jonathan died in his sleep. In an attempt to avoid problems, she and her two teenage sons decided to burn the family's mobile home and incinerate Jonathan's body in the process. They also planned to leave Donald, a mentally ill teenager who lived with the

5

family in the mobile home, with Jonathan to avoid any appearance that Jonathan had been unattended. One of Seibert's sons set the fire and Donald died. (*Seibert, supra*, 542 U.S. at p. 604.) Five days later, the police arrived at 3:00 a.m. at the hospital where one of Seibert's teenage sons was being treated for burns and arrested Seibert. They took Seibert to the police station, interrogated her for 30 to 40 minutes, and accused her of planning to kill Donald in the process of burning her home, all without giving her *Miranda* warnings. (*Seibert, supra*, 542 U.S. at pp. 604-605.) When Seibert admitted intending for Donald to die in the fire, the police gave her a 20-minute coffee and cigarette break, administered *Miranda* warnings, and got her to repeat the admission that she knew Donald was supposed to die in his sleep during the fire. (*Seibert, supra*, 542 U.S. at p. 605.) The interrogating officer said he "made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " (*Id.* at pp. 605-606.)

The *Seibert* court addressed "police protocol for custodial interrogation." (*Seibert, supra*, 542 U.S. at p. 604.) And the court condemned what it called a two-step interrogation technique. (*Ibid*.) On this issue, the court concluded, "this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement," and it held "a statement repeated after a warning in such circumstances is inadmissible." (*Ibid*.) The court noted that custodial interrogations of this nature "reveal a police strategy adapted to undermine the *Miranda* warnings." (*Seibert, supra*, 542 U.S. at p. 616, fn. omitted.)

B.      *Circumstances of Interrogation*

Defendant does not challenge the factual findings made by the trial court in the suppression hearing. In fact, on appeal, he claims he "arguably raises a pure question of law . . . . [Citation.]" Because defendant does not challenge the trial court's factual findings with respect to the suppression motion ruling, we recount the circumstances of

6

the interrogation consistent with those factual findings and in the light most favorable to the ruling.

On July 19, 2010, about two weeks after the explosion, defendant agreed to go to the police station with his wife and two stepdaughters to be interviewed about the circumstances of the explosion. Defendant drove to the police station.

At the police station, Detective Greg Halstead and Detective Thomas Higgins interviewed defendant. The interview on July 19 took place in three stages: first the detectives interviewed defendant; second a polygraph examiner interviewed defendant and administered a polygraph test; and, third, the detectives again interviewed defendant. Defendant arrived at the police station around 4:30 p.m., and he left after 1:00 a.m. There were long breaks during the questioning.

During the first part of the interview, the detectives questioned defendant concerning the circumstances of the explosion, and he denied having anything to do with it. They told defendant that they knew that the candle came from his house and that they did not believe his denials. The detectives suggested that defendant may not have intended to blow up the house, and they discussed different punishments based on intent. They falsely told him that they had found his DNA on the gas valve. The detectives asked defendant to take a polygraph test, and he agreed.

During the polygraph test, defendant denied causing the explosion, but the polygraph examiner told him that the test was "negative." Defendant continued to deny involvement. After the polygraph examiner continued to suggest that defendant was involved and could not remember because he was drunk, defendant responded that he knew he did it because the polygraph test said he did and his DNA was found in the house, even though he did not remember.

Because defendant's wife had taken the car home, the detectives eventually returned and questioned defendant again. Defendant said he must have caused the explosion because the polygraph test said he did and his DNA was in the house.

7

However, defendant finally stated that he entered the house, lit the candle, turned on the gas, and left.

Defendant left the police station in a taxi, but he was arrested before he got home and booked at the jail around 1:30 a.m. About nine and a half hours later, on July 20, the detectives met with defendant at the jail, advised him of his *Miranda* rights, and took his statement. He again admitted causing the explosion.

During the entire July 19 interview (which lasted past midnight), the doors to the interview rooms were not locked, and the detectives and polygraph examiner repeatedly told and assured defendant that he was free to leave. For example, when defendant claimed the detectives would not let him leave unless he took the polygraph test, the polygraph examiner was emphatic that he was free to leave. Late in the July 19 interview, defendant was asked why he did not leave, and he responded that he had nothing to hide. He affirmed that he had not been tricked or intimidated.

C.       *Forfeiture of Argument*

In arguing in his opening brief that the statement should have been excluded, defendant disregards the trial court's crucial findings concerning the facts. Most importantly, defendant relies on a transcript of his statements that the trial court expressly found to be unreliable. This appellate strategy forfeits review of the issue.

Review of a trial court's ruling concerning the admissibility of a defendant's statement is a two-part analysis. "[W]e accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility, provided that these findings are supported by substantial evidence. [Citation.] But we determine independently, based on the undisputed facts and those properly found by the trial court, whether the challenged statements were legally obtained. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 733.)

When the appellate standard is substantial evidence review, as it is here with respect to the trial court's factual findings, the appellant bears the burden of showing that no substantial evidence supports the challenged factual findings. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282.) Failure to set forth the evidence most favorable to the factual findings – or, as in this case, to acknowledge that the factual findings even exist, along with supporting evidence – results in forfeiture of the contention that substantial evidence does not support the factual findings. (*Foreman & Clark Corp. v. Fallon, supra,* at p. 881.)

Defendant's contention that his statement should have been excluded begins with an assertion that is not true. He claims: "There is no question as to what happened here." Later, he asserts: "There is little question that the detectives here employed a deliberate two step interrogation technique designed to circumvent the requirements of *Miranda*." Contrary to this assertion that there is "no question" or "little question" concerning what happened with respect to defendant's statements, that is the major question resolved by the trial court. The court held that the police officers did not use a two-step interrogation technique to circumvent the requirements of *Miranda*, and it is defendant's burden to establish on appeal that the trial court's finding was in error.

In attempting to carry his burden, defendant cites to a transcript that the trial court found was unreliable, and he cites specifically some of the interview the trial court stated was not transcribed correctly.[2] The court reviewed the transcripts of the interviews and listened to the actual recordings, and the court told the parties: "[A]s I indicated to both counsel earlier, the transcripts are not accurate as to what is actually on the recording, in many places . . . ."

---

[2] The Attorney General notes that the trial court found the transcript of the interview inaccurate, but she neither challenges defendant's use of the unreliable transcript nor notes the discrepancies between the transcript and the trial court's factual findings.

9

Defendant claims that he asked the detectives during the July 19 interview why he could not go home. However, the trial court found that he did not ask that question. Instead, he asked what was taking so long. The transcript was wrong. The trial court noted that the detectives asked him why he did not just leave, and defendant responded that he had nothing to hide. The trial court inferred from this that, even late in the interview process, defendant was aware of his ability to terminate the interview at any time. Defendant does not mention these factual findings in his opening brief.

Defendant recounts statements he made to the polygraph examiner to the effect that if he did not take the polygraph test he could not go home and that he was being kept there against his will. However, defendant gives short shrift to the assurances of the polygraph examiner that he was free to leave and that he did not have to take the polygraph test. The trial court, on the other hand, noted that the polygraph examiner told defendant, emphatically and repeatedly, that he was free to go. Defendant does not mention this factual finding in his opening brief.

Citing his own testimony at the suppression hearing, defendant states in his opening brief that, "[w]hile he was told he was free to go, the door was always locked and he could never leave." The court found, however, that "[t]he doors were never locked." Defendant does not mention this factual finding in his opening brief.

Defendant claims in his opening brief that during the July 19 interview he could hear his stepdaughter screaming in the other room and that it "tore [him] apart." However, defendant lied about hearing his stepdaughter scream.

At the hearing on the suppression motion, defendant testified that he could hear his stepdaughter screaming in the other room three or four times, "[e]very time [the detectives] came in or left the room." He could also hear her when the doors were closed, and the screaming continued for up to two hours. Defendant testified that hearing his stepdaughter screaming caused him to say something he "would not normally say"

10

and he said those things "[t]o get [his] [step]daughter out of the room." He also testified that he asked, "[W]hat's up with my daughter" and, "[W]hy can't my family go."

Defendant's wife testified at the suppression hearing that there was only one time her daughter screamed while defendant was being questioned. The daughter did not like being in confined spaces and, when the door shut, she screamed. An officer returned to the room and propped the door open.

The trial court made the following factual findings concerning the matter: "I will address [defendant's] comments today regarding the fact that he heard his [step]daughter yell in the other room or scream in the other room. [¶] His testimony was that he heard it three or four times at different times. [¶] And [defendant's wife] indicated she remembers one time, not multiple times. [¶] But throughout all of the tapes – and I listened to all of them – there was never ever a mention by [defendant] to the detectives of what's going on with my daughters, never, not once."

So the trial court concluded that defendant's testimony about his stepdaughter's screaming and his making statements because of that screaming was not credible and was contradicted by other evidence. Defendant mentions these factual findings only briefly in his opening brief, stating, "The court rejected the idea that [defendant's step]daughter was screaming during the interrogation . . . ." As noted, however, defendant included this nonexistent circumstance in his factual summary of his opening brief.

The effect of defendant's appellate strategy is forfeiture, not persuasion. In support of his argument that his July 20 confession should have been excluded, defendant twists the facts in his favor and even cites nonexistent facts rather than stating the facts in the light most favorable to the ruling and rather than acknowledging and dealing with the trial court's factual findings. The strategy is flawed; his statement of facts relating to the confession is completely unreliable; and the outcome is that he forfeited review of the confession issues. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.)

11

D.    *Analysis of the Merits*

Even if defendant had not forfeited review of whether his July 19 interview was custodial and his July 20 interview was the second part of a two-step interrogation technique prohibited by *Seibert*, we would conclude that the July 19 interview was not custodial and, therefore, *Seibert* was not implicated and the July 20 interview was not tainted.

"An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' (*Miranda v. Arizona, supra*, 384 U.S. at p. 444.)  Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.' " ' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

When the evidence is viewed in the light most favorable to the ruling, it is evident that defendant was not in custody during the July 19 interview.  Defendant was not formally arrested; the doors were not locked; and defendant was told repeatedly that he was free to leave.  At the end of the long interview, he told the detectives that he stayed because he had nothing to hide.  Under the objective standard cited above, defendant was not in custody.

II

*Exclusion of Expert Testimony*

Defendant sought to introduce expert testimony that the police interrogation tactics used on him on July 19 may have caused him to falsely confess.  While allowing defendant to freely introduce the evidence of the interrogation tactics, the trial court excluded the proffered expert testimony.  On appeal, defendant contends that exclusion of the expert testimony was a prejudicial abuse of discretion and violated his right to present a defense.  The contention is without merit.

12

A.    *Procedural Background*

The court held a hearing on whether to admit the expert testimony concerning false confessions, which included a 250-slide PowerPoint presentation prepared by the expert. The court informed defense counsel that the expert would not be allowed to use the 250-slide presentation under Evidence Code section 352 because it was in the form of a lecture, not testimony of an expert.

The trial court recognized Dr. Deborah Davis as an expert in the field of false confessions. Dr. Davis testified at the Evidence Code section 402 hearing that (1) suspects sometimes falsely confess what they have not done and (2) many people mistakenly believe that no suspect falsely confesses. Circumstances such as interrogation techniques (presenting false or misleading evidence or using polygraph tests, for instance), as well as the length of the interrogation, sleep deprivation, high stress, and distrust of one's own memory may result in a false confession.

The trial court provided an extensive Evidence Code section 352 analysis in its ruling excluding the testimony. In summary, the court found that the evidence was minimally probative in this case because it did not go beyond the common experience of the jurors. The court noted various parts of the testimony that would be too general to be helpful or would be confusing. In fact, the jurors had been asked during voir dire concerning their acceptance of the phenomenon of false confessions and had indicated their acceptance. The minimal probative value was substantially outweighed by the danger that the evidence would confuse or mislead the jury and consume an undue amount of time.

B.    *Analysis*

"A trial court has broad discretion to exclude relevant evidence under Evidence Code section 352 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial

danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352; accord, *People v. Lee* (2011) 51 Cal.4th 620, 643.) Such 'discretion extends to the admission or exclusion of expert testimony.' (*People v. Richardson* (2008) 43 Cal.4th 959, 1008; accord, *People v. Curl* (2009) 46 Cal.4th 339, 359.) We review rulings regarding relevancy and Evidence Code section 352 under an abuse of discretion standard. (*People v. Lee*, at p. 643.)" (*People v. Linton* (2013) 56 Cal.4th 1146, 1181 (*Linton*); see also *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772 [trial court acts as gatekeeper in determining admissibility of expert testimony].)

Generally, absence of abuse of discretion in excluding expert testimony concerning false confession also means the defendant's right to present a defense was not violated. (*Linton, supra,* 56 Cal.4th at p. 1181.) "Although a defendant has the general right to offer a defense through the testimony of his or her witnesses, 'a state court's application of ordinary rules of evidence – including the rule stated in Evidence Code section 352 – generally does not infringe upon this right . . . . [Citations.]" (*Linton, supra,* at p. 1183.)

The California Supreme Court, in *Linton*, recently considered a claim that exclusion of expert testimony about false confessions was an abuse of discretion and violated the defendant's right to present a defense. The *Linton* court rejected the claim, concluding that where there was a "dearth of evidence indicating a false admission or confession," as well as a "multitude of corroborative evidence . . . that suggested defendant's admissions and confession were true." (*Id*. at p. 1182.) Under these circumstances, "it fell within the trial court's broad discretion to determine that [the expert's] proffered testimony had, at most, minimal probative value, which was substantially outweighed by its likely undue consumption of time. [Citations.]" (*Ibid*.)

Likewise, here, there was a dearth of evidence indicating that defendant's confession was false. The details of his confession matched the facts of the crime

14

produced at trial. Defendant admitted that he entered the house, lit the candle, and opened the gas valve. The candle was from defendant's house, and defendant was present at the scene during the time when the acts occurred. Defendant readily admitted that he did not like Liu, and he had already stolen items from the house.

In addition to the corroborating evidence, there was evidence that suggested defendant would not be susceptible to giving a false confession, especially during the July 20 questioning at the jail. He was sophisticated in criminal matters, with several prior convictions. There was a long period of time, about nine hours, between his first confession in the July 19 police station interview and the second confession in the July 20 jailhouse interview. In the meantime, he had been formally arrested and booked into jail, and the pressures of the police station interview, such as the questioning of his family members, were diminished.

This is not a close case in which evidence concerning whether police interrogation tactics could produce a false confession would have been helpful to the jury. Therefore, the trial court did not abuse its discretion in excluding the expert testimony, and the exclusion of the testimony did not violate defendant's right to present a defense.

III

*Attorney and Booking Fees*

Defendant contends that we must reverse the trial court's orders imposing booking and classification fees under Government Code section 29550.2 and assessing attorney fees under Penal Code section 987.8. We conclude defendant forfeited the contentions. Defendant further contends, however, that he was entitled to have a jury determine whether he had the ability to pay and what the actual costs were to the county. This contention is without merit because the fees at issue here are materially different from criminal fines subject to the right to a jury trial.

A.    *Forfeiture*

15

Under Government Code section 29550.2, subdivision (a), "[a]ny person booked into a county jail pursuant to any arrest . . . is subject to a criminal justice administration fee for administration costs incurred in conjunction with the arresting and booking if the person is convicted of any criminal offense relating to the arrest and booking. The fee which the county is entitled to recover pursuant to this subdivision shall not exceed the actual administrative costs . . . . If the person has the ability to pay, a judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee by the convicted person, and execution shall be issued on the order in the same manner as a judgment in a civil action . . . ."

Penal Code section 987.8 provides that a court may order defendant to pay the cost of court-appointed counsel after a hearing to determine if defendant has the ability to pay. "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." (Pen. Code, § 987.8, subd. (b).)

At sentencing, the trial court ordered the defendant to pay $321.51 in booking and classification fees and $3,175 in attorney fees for appointed counsel, but it did not hold a hearing on defendant's ability to pay or to determine actual costs. Defendant did not object to the fees.

The right to appellate review of a nonjurisdictional sentencing issue not raised in the trial court is forfeited. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751-755; *People v. Scott* (1994) 9 Cal.4th 331, 356.) This rule of forfeiture applies not just to matters of sentencing procedure, but also to matters of sufficiency of evidence to support fines and fees. (*People v. McCullough* (2013) 56 Cal.4th 589, 597.)

Citing *People v. Viray* (2005) 134 Cal.App.4th 1186, defendant asserts that defense counsel's failure to ask for a hearing on defendant's ability to pay the attorney

16

fee reimbursement order does not forfeit his contention on appeal. In *Viray*, the Court of Appeal was confronted with a similar claim and held that a forfeiture cannot "properly be predicated on the failure of [defense counsel] to challenge an order concerning his own fees," given the "patent conflict of interest." (*Id.* at p. 1215, italics omitted.) Defendant asks us to follow *Viray* and consider his claim notwithstanding his failure to raise it below.

We are not persuaded by *Viray*. As a practical matter, the reimbursement fee does not go to defense counsel but to the county in which he is prosecuted (Pen. Code, § 987.8, subd. (e)); counsel will be paid whether or not defendant pays the fee. Also, we are also unwilling to presume defense counsel would be so willing to sacrifice the client's best interests and thereby violate the rules of professional conduct. (See Rules Prof. Conduct, rules 3-110 [duty to act competently], 3-310 [avoid interests adverse to client].)

Since there is no valid reason to disregard the failure to object to the fees in the trial court, the contention that they were improperly imposed is forfeited on appeal.

B.     *Jury Determinations*

Defendant also argues he was entitled to a jury determination, based on the reasonable doubt standard, of his ability to pay and the actual costs to the county for booking and his court-appointed attorney. Defendant relies on the recent United States Supreme Court decision, *Southern Union Co. v. United States* (2012) 567 U.S. __ [183 L.Ed.2d 318] (*Southern Union*), to support his contention. The criminal fines at issue in *Southern Union*, however, are materially different from the administrative fees at issue here.[3]

---

[3]     At the time of defendant's sentencing, *Southern Union* had not yet been decided. Thus, defendant arguably did not forfeit this claim by his failure to request a jury trial. (See *People v. Black* (2007) 41 Cal.4th 799, 810 ["although challenges to procedures or to the admission of evidence normally are forfeited unless timely raised in the trial court, 'this is not so when pertinent law later changed so unforeseeably that it is unreasonable to

17

In *Southern Union*, the Supreme Court held that the Sixth Amendment right to a jury applies to "sentences of criminal fines." (*Southern Union, supra,* 567 U.S. at p. ___ [183 L.Ed.2d at p. 325].) There, the violations at issue were punishable by, among other things, a fine of up to $50,000 for each day of violation. A jury found Southern Union Company violated the law, but made no specific factual finding as to the number of days it was in violation. (*Ibid*.) The trial court imposed an aggregate fine of $38.1 million, concluding from the " 'content and context of the verdict all together' that the jury found a 762-day violation." (*Id*. at p. ___ [183 L.Ed.2d at p. 326].)

The Supreme Court held that the district court's factual finding as to the number of days Southern Union Company committed the crime violated its Sixth Amendment right to a jury determination. (*Southern Union, supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 328].) In reaching its decision, the Supreme Court held that "[c]riminal fines, like . . . other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union, supra*, at p. ___ [183 L.Ed.2d at p. 327].)

The instant case is distinguishable from *Southern Union*. Here, neither of the fees at issue is a penalty "inflicted by the sovereign for the commission of offenses." (*Southern Union, supra*, 567 U.S. at p.___ [183 L.Ed.2d at p. 327].) Rather, fees imposed pursuant to Government Code section 29550.2 and Penal Code section 987.8 are administrative in nature. (See *People v. Rivera* (1998) 65 Cal.App.4th 705, 707-708 [administrative fees not ex post facto punishment].) Unlike the criminal penalties imposed in *Southern Union*, the administrative fees are "assessed against all convicted offenders who have the ability to pay, without regard to the nature or severity of their

---

expect trial counsel to have anticipated the change' "]; *People v. French* (2008) 43 Cal.4th 36, 48 [waiver of jury trial on lewd conduct with child did not waive his right to jury trial of aggravating sentencing factor of taking advantage of position of trust and confidence, where at time of plea, no right to jury trial on such circumstance had been recognized].)

respective offenses." (*People v. Rivera, supra,* at p. 708.)  In short, the fees are *not* a penalty inflicted for the commission of crimes and do not depend on a determination concerning the extent of the crimes.  Therefore, the administrative fees need not be determined by a jury.

DISPOSITION

The judgment is affirmed.


                                                            NICHOLSON            , J.



We concur:



      BLEASE            , Acting P. J.



      BUTZ            , J.