Filed 5/17/16  P. v. Garcia CA4/1
Opinion on remand from Supreme Court CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

OPINION ON REMAND FROM THE CALIFORNIA SUPREME COURT

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062659 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN291820) |
| HUGO GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel B. Goldstein, Judge.  Affirmed in part and reversed in part, in accordance with *People v. Garcia* (2016) 62 Cal.4th 1116.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Hugo Garcia of burglary (Pen. Code, § 459; counts 1 & 4); robbery (Pen. Code, § 211; count 2); kidnapping with intent to commit rape (Pen. Code, § 209, subd. (b)(1); count 3); forcible rape (Pen. Code, § 261, subd. (a)(2); count 5); rape by a foreign object (Pen. Code, § 289, subd. (a); count 6); unlawful taking or driving of a vehicle (Veh. Code, § 10851, subd. (a); count 7); and attempted robbery (Pen. Code, §§ 664 & 211; counts 8 & 9). As to counts 2, 3, 8 and 9, the jury found true defendant personally used a firearm during the commission of the offenses. (Pen. Code, § 12022.53, subd. (b).) As to counts 5 and 6, the jury also found true that defendant kidnapped the victim with the movement substantially increasing the risk of harm to the victim (Pen. Code, § 667.61, subd. (d)(2)), committed the offenses during the commission of a burglary (Pen. Code, § 667.61, subd. (e)(2)), engaged in the tying or binding of the victim (Pen. Code, § 667.61, subd. (e)(5)) and personally used a firearm (Pen. Code, § 667.61, subd. (e)(3)).[1] The court sentenced defendant to prison for an aggregate term of 74 years four months to life.

In the published portion of our opinion (*People v. Garcia* (2014) 224 Cal.App.4th 1310, reviewed granted July 9, 2014, S218233), we held there was sufficient evidence in

---

[1] The jury found defendant not guilty of burglary (Pen. Code, § 459; count 10) and of grand theft of a firearm (Pen. Code, § 487, subd. (d)(2); count 11). All further statutory references are to the Penal Code unless otherwise indicated.

the record to support the jury's findings that defendant committed two burglaries under section 459 in connection with his robbery of a store and its store employee (count 1), and his subsequent rape of that employee in a bathroom located behind an office in the very back of the store (count 4).

In the unpublished portion of our opinion, we further held that defendant's conviction on count 4, burglary with the requisite felonious intent to commit sexual assault, should have been stayed pursuant to section 654, subdivision (a); that the evidence was sufficient to support his convictions on counts 8 and 9 for attempted robbery; that the court properly instructed the jury in connection with count 6, rape by a foreign object; that the trial court properly imposed consecutive sentences on defendant of 25 years to life on counts 5 and 6, as mandated under section 667.61; that the court properly imposed a $10,000 restitution fine under former section 1202.4, subdivision (b)(1); and finally, that the abstract of judgment should be corrected to stay the term for count 3 and its enhancement and to impose the 25 years to life term on count 5 to run consecutively to the unstayed terms.

Our high court granted defendant's petition for review. The court subsequently held defendant could not be convicted of "dual burglary convictions" in counts 1 and 4. (*People v. Garcia* (2016) 62 Cal.4th 1116, 1120 (*Garcia*).) The court thus reversed defendant's burglary conviction in count 4 because the "evidence of the bathroom's location and characteristics [was] insufficient to show that it provided to the occupants a separate and reasonable expectation of protection from intrusion and danger, beyond that

provided by the shop itself." (*Ibid.*) The court remanded the case for "further proceedings consistent with [its] opinion." (*Id.* at p. 1133.)

In compliance with the court's directive in *Garcia*, we now reverse defendant's burglary conviction on count 4 and also reverse the true finding that defendant committed counts 5 and 6, rape and rape by a foreign object, respectively, during the commission of that burglary. We direct the trial court to prepare an amended abstract of judgment (1) to reflect this change and, as we discuss, (2) to correct the judgment as pronounced by the court at sentencing, namely, staying the term for count 3 and its enhancement and imposing the 25-years-to-life term on count 5 to run consecutively to the unstayed terms. The trial court is further directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Offenses against M.*

Victim M. in May 2011 was working at a store located in Escondido, California providing services for low income families and women who are pregnant, breastfeeding or just had a baby (store). M. saw a young man, later identified as defendant, slowly riding his bicycle in front of, and looking into, the store. After G.C., a fellow employee of M., left for the day, the man entered the store, looked around and then smiled at M.

_____

[2] We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by defendant are discussed *post*.

4

and left.  Shortly thereafter, the man reentered the store, went to the counter near where M. was standing and started asking M. what she described were "weird" questions about the store's voucher program.  The man held a cell phone in one hand, and his other hand was inside his jacket pocket.  M. became concerned by the man's behavior.  M. used her cell phone to message G.C. that there was a man inside the store asking "weird" questions and that she was scared.  G.C. called back on the store phone, but M. could not speak candidly with G.C. because the man was standing nearby.  M. thus hung up the phone.

The man next asked M. about a jar of candies located on the counter.  As M. was opening the jar to give the man some candy, he pulled a gun out of his jacket pocket, pointed it at M. and ordered her to hand over the money from the cash register.  M. complied and told the man not to hurt her.  M. put the money in a bag.  While still pointing the gun at M., the man asked M. if she had any money.  M. next pulled a few dollars from her pants pocket and also put it into the bag.

The man directed M. to close the front door of the store and followed behind her with the gun pointed at her back as she walked to the door.  The man then made M. remove the "open" sign hanging by the door and turn off the store lights.

M. asked the man to leave.  Instead, the man pointed the gun at M. as they began walking toward the back of the store.  They stopped near some refrigerators, and he asked M. if she had the key to the office door, which was closed and locked.  She said no.  He then asked M. if the store had a bathroom.  M. said yes, but she refused to go down the hallway into the bathroom, which was located behind the office in the very back of the

5

store, out of sight from the main part of the store.  M. next got on her knees and begged the man not to harm her, telling him she had a daughter waiting for her at home.  The man in response told M. to remove her clothes.  M. again asked the man not to harm her, but he waved the gun back and forth at her, a gesture she understood to mean for her to go to the bathroom and take off her clothes.  Scared, M. went into the bathroom and removed her pants and blouse.

While still pointing the gun at M., the man entered the bathroom and demanded that she remove her underwear and bra.  She complied.  He next made M. turn and face him inside the bathroom.  He left the bathroom and returned a short time later with some "hair bands" sold by the store that M. described as bands a little girl might put around her entire head to keep the hair out of her face.  The man tried to use the hair bands to tie up M.'s hands but, because he was still holding the gun and kept it near M.'s chest area, she offered to tie up her own hands so he did not "accidently" shoot her.  The man left the bathroom again and returned holding more hair bands.  The man asked M. to tie up her feet but, because she was shaking, she could not do so and ended up breaking the bands.  As she was attempting to tie up her feet, the man again left the bathroom.

When the man returned yet again to the bathroom, his fly was open and his erect penis was exposed.  The man made M. turn around and face the mirror in the bathroom so that her back was to him.  While still pointing the gun at M., he digitally penetrated, and then put his penis inside, her vagina.  The man also touched her breasts and put his hands on the back of M.'s neck and pushed her head down.  When M. began to cry, the

6

man gestured for her to be quiet. After the sexual assault, M. felt "wet" in her vaginal area. She saw the man wipe himself with a paper towel or napkin and throw it away.

The man told M. to stay put. After he left the bathroom, M. struggled to get dressed. The man returned to the bathroom and then left. M. walked out of the bathroom, toward the main part of the store, where she saw the man opening and looking in some drawers. He ordered M. back into the bathroom and eventually closed the bathroom door with her inside. M. sat on the bathroom floor for a short while. When she could no longer hear anyone inside the store, M. came out of the bathroom and found the store empty. She walked outside, heard a car start and saw the man drive off in her white SUV. M. went to a nearby business for help. An employee of the business called police.

B. *Offenses against S. & Y.*

At about 9:15 p.m. that same day, S. and Y. closed an Escondido check-cashing store (check-cashing store) where they were working, left through the front door and headed towards the back parking lot. S. testified it was a "really slow day" and, thus, they closed the check-cashing store about 15 to 25 minutes earlier than normal.

As they walked to their cars, they saw a white SUV parked nearby and a man later identified as defendant standing next to the SUV, with his back turned. As they continued walking toward their cars, the man turned around and began walking towards S. and Y. He then told them in broken English to stop and demanded they reopen the check-cashing store. S. and Y. pretended not to hear the man but, as they got closer and he repeated to them, "you got to stop," they saw the man was holding a gun. The man

7

was waving the gun in the direction of the door of the check-cashing store, telling them to open the door and not be "stupid."

S. and Y. started walking backwards as the man continued to walk towards them, gesturing with the gun and demanding they open the check-cashing store. As S. and Y. got closer to a nearby gas station, the light from the station illuminated the man's face. S. and Y. then turned, ran to the gas station and called police. The man drove off in the white SUV. They gave police a description of the man and his vehicle. As discussed *post*, they went to the police station a short time later, after the man had been apprehended, and identified defendant as the man that had pointed the gun at them.

Law enforcement arrested defendant in Escondido at about 9:30 p.m. that same night as he stood in front of the white SUV while it was parked in front of a laundromat, which was located near the check-cashing store. Law enforcement found a .22-caliber revolver in his front pocket. There were four bullets in the gun's chamber, including one behind the hammer so that the gun would fire if the trigger was pulled.

Police went to the store where M. had been sexually assaulted and found four hair ties in the bathroom, two of which were torn and/or broken. Police also found an open package of hair ties on a shelf located in the main area of the store.

Inside M.'s SUV, police found a sports drink bottle. After his arrest, police found in defendant's backpack a roll of clear packing tape, a pair of scissors and several bills in different denominations.

8

Samples taken from M.'s vagina showed the presence of sperm.  These samples and the samples taken from the sports drink bottle found inside M.'s SUV matched the DNA profile of defendant.

In his statement to police that was played for the jury, defendant admitted to the robbery of the store and M. and his rape of M. in the bathroom.  Defendant also admitted he stole M.'s SUV.  However, he denied the attempted robbery of S. and Y. at the check-cashing store.

## DISCUSSION

## I

## Substantial Evidence Review

A.  *Counts 1 and 4 and the Burglaries at the Store*

As noted, our high court in *Garcia* held that defendant's burglary conviction in count 4 must be reversed for lack of substantial evidence.  (*Garcia*, *supra*, 62 Cal.4th at p. 1120.)  We conclude, however, that defendant was properly convicted of burglary in count 1, which, in any event, we note defendant did not directly challenge on appeal.  We thus *briefly* review that conviction.

"'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  The standard of review is the same in cases in which the People rely mainly on circumstantial evidence.  [Citation.]

9

"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.)

Section 459 defines the crime of burglary as entry into "any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building . . . with intent to commit grand or petit larceny or any other felony . . . ."

Here, the record shows that before defendant entered the store, he slowly rode his bicycle in front, looking inside. When fellow employee G.C. left for the day, defendant for the first time entered the store, looked around and then abruptly left. A short time later, defendant reentered the store, started asking M. what she described as "weird" questions and subsequently pulled out a gun from his jacket pocket, pointed it at M. and demanded that she hand over the money from the store's cash register. While still pointing a gun at M., defendant next demanded that she hand over any money she had on

10

her person.  We conclude this evidence provides ample support for defendant's burglary conviction on count 1.

B.  *Counts 8 and 9 and the Attempted Robbery of S. and Y.*

Defendant contends the evidence is insufficient to support the jury's finding that he possessed the specific intent to commit the attempted robbery of S. and Y.  Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

"An attempt to commit a crime is comprised of 'two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' (§ 21a; see § 664 [prescribing punishment].)  Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense.  [Citations.]  We have explained that 'under California law, "[a]n attempt to commit a crime is itself a crime and [is] subject to punishment that bears some relation to the completed offense." [Citation.] . . . [¶] . . . "One of the purposes of the criminal law is to protect society from those who intend to injure it.  When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime." [Citation.]' [Citation.]" (*People v. Medina* (2007) 41 Cal.4th 685, 694, fn. omitted.)  "Intent to steal is often proved by circumstantial evidence." (*People v. Abilez* (2007) 41 Cal.4th 472, 508.)

11

Here, the record shows that S. and Y. closed the store earlier than usual on the night of the crime because it had been a "really slow day" at work; that as S. and Y. walked toward their cars, a man later identified as defendant approached them, told them to stop and demanded that they reopen the store; that S. and Y. pretended not to hear defendant and kept walking but, as they got closer, defendant said, "you got to stop," pulled out a gun and used it to wave them in the direction of the front door of the check-cashing store while repeating his demand that they open the door and telling them not to be "stupid"; that defendant admitted to law enforcement during a postarrest interview he needed money and considered robbery that morning; that defendant knew the check-cashing store dealt with money because his girlfriend's mother had used it to cash checks and pay loans; that a few hours earlier, defendant had robbed the store and M. of only about $73; and that after S. and Y. ran to the gas station, defendant left in the SUV and drove to a nearby laundromat, where he waited outside the vehicle.

Viewing the evidence in the light most favorable to the prosecution (*People v. Watkins* (2012) 55 Cal.4th 999, 1019), we conclude this evidence is more than sufficient to support the finding of a rational trier of fact that defendant had focused on and intended to rob S. and Y. (See *id.* at pp. 1019-1021 [rejecting the defendant's contention there was insufficient evidence in the record to support his attempted robbery conviction of a victim after the evidence showed defendant already had robbed three people at gunpoint before he and his accomplice drove to a hotel and pretended their car broke down as they watched the victim unloading suitcases from his car, and noting that

12

*""""""[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment*""""""].)

II

Count 6 and Instructional Error

The record shows the trial court instructed the jury with CALCRIM No. 1045 as follows:

"The defendant is charged in Count Six with sexual penetration by force, fear, violence, menace, or fear of immediate and unlawful bodily injury to another, in violation of Penal Code section 289(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using a foreign object or unknown object; [¶] 3. The other person did not consent to the act; [¶] AND [¶] 4. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to anyone.

"*Sexual penetration* means penetration, however slight, of the genital or anal opening for the purpose of sexual abuse, arousal, or gratification.

"A *foreign object* includes any part of the body except a sexual organ.

"An *unknown object* includes any foreign object, substance, instrument, or device, or any part of the body, **including a penis**, if it is not known what object penetrated the opening.

13

"Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury, or discomfort.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is *accomplished by fear* if the other person is actually and reasonably afraid."  (Original italics; bold added.)

Defendant contends the trial court had a sua sponte duty to modify CALCRIM No. 1045 to exclude the bold font above—including a penis—from the definition of an "unknown object" with respect to count 6, rape of M. by a foreign or unknown object, because he contends there allegedly was only a single and uninterrupted sex act in the instant case and because count 5 alleged forcible rape of M.  According to defendant, it therefore was possible for the jury to convict him on counts 5 and 6 for the same act of penile penetration.

The People contend CALCRIM No. 1045 tracks the language of section 289, subdivision (k)(2) and (3) regarding the definition of "foreign object" and "unknown

14

object," respectively, and, as such, it was incumbent on defendant to request any further clarification or amplification he deemed appropriate and his failure to do so constitutes a forfeiture of this issue on appeal. The People further contend that, on the merits, there was no instructional error because it was not reasonably likely a jury construed them in the manner claimed by defendant. Because we agree with the People's latter contention, we do not address forfeiture.

"When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citations.] We assume that the jurors are ""'intelligent persons and capable of understanding *and correlating* all jury instructions . . . given.""' [Citation.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)

Here, our examination of the entire record shows no reasonable likelihood the jury was misled or applied CALCRIM No. 1045 in the manner asserted by defendant. Indeed, as noted *ante*, the record shows the jury saw the video interview of defendant where he admitted to the officers that he digitally penetrated M. inside the bathroom about seven or eight times. This testimony was confirmed by M., who also said she could feel defendant's fingers inside her vagina as he stood behind her in the bathroom.

In addition, during closing argument, the prosecutor was clear that count 5, forcible rape, occurred (if at all) when defendant held a gun to M. and used his penis to

15

penetrate her vagina without consent.  Regarding count 6, the prosecutor stated a "foreign object" for purposes of forcible sexual penetration "includes any part of the body except a sexual organ; right?  And that's because we already have a crime that's laid out for when you use a sexual organ, that is rape.  There's an exception to that however, is it could, if the woman didn't know what it was that was inside of her turns out that it happened to be a penis, you could still use this statute [i.e., § 289].  *In this case that's not a question because she knows that the penis and his fingers were inside of her.*"  (Italics added.)

During the closing argument of the defense, the record shows that counsel stated that defendant "absolutely admits to digital penetration" of M.'s vagina.  During rebuttal, the prosecutor noted the penetration for purposes of the verdict form on count 6 was defendant's fingers, a "foreign object."  Finally, in reviewing the jury verdict form for count 6, we note it repeatedly used only the term "foreign object," which excluded from its definition a sexual organ, and *not* the term "unknown object," which included in its definition a penis, in the questions to be answered by the jury on this count.

In light of the instructions as a whole—including the exclusion of a sexual organ from the definition of a "foreign object" as set forth in subsection (k)(2) of section 289, and the evidence in the record—including the arguments of counsel and the verdict form itself, we conclude it was not reasonably likely that the jury applied CALCRIM No. 1045 to find the "foreign object" that penetrated M. for purposes of count 6 was defendant's

16

penis, as opposed to his fingers.[3]  (See *People v. Franco*, *supra*, 180 Cal.App.4th at p. 720.)  We thus conclude there was no instructional error in connection with count 6.

---

[3]    As such, we also reject defendant's alternate contention that the trial court was required to give a unanimity instruction on the nature of the "foreign object" used, inasmuch as the evidence in the record overwhelmingly shows defendant's fingers were the "foreign object" used to penetrate M.'s vagina in connection with count 6 and, in any event, this term excludes a penis from its statutory definition.  (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 [noting the "requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed,'" and noting that "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty"].)

III

Sentencing Issues Counts 5 and 6

A. *Additional Background*

Defendant contends the trial court erred when it sentenced him to consecutive terms of 25 years to life on counts 5 and 6 because he allegedly committed one indivisible act of rape that violated two statutes. The record shows the prosecutor initially believed that defendant should have received concurrent sentences on these two counts because M. was unsure whether defendant penetrated her vagina with his finger and penis at the same or separate times. At the sentencing hearing, the record shows that the prosecutor reiterated this belief and that defense counsel noted there could be "two separate, distinct purposes" but that, in this case, the "use of digital penetration in order to accomplish penile penetration would be one act."

The trial court disagreed. In so doing, the court noted the act of digital penetration was entirely separate from the act of penile penetration:

"Wouldn't it necessitate that, as I heard the evidence, that they were completely separate acts, that they [i.e., the digital and penile penetrations] were distinctly different functions. And even though they are not temporally isolated, they are in the physical act itself. And each act requires a different intent, one is digital penetration, the other is a thoughtful, knowing penile penetration. And those are two separate acts that require goal-oriented behavior leading to a goal-oriented outcome . . . ."

18

In response, the defense argued—as it does on appeal—that the use of digital penetration to accomplish the penile penetration "would be one act. So, if you're using it *just* for that purpose it would be one act." (Italics added.) The court expressed skepticism with this analysis but found the evidence did not support it in any event:

"Yeah, well, I don't know if I agree with that. But that's not the evidence that I heard. And not to engage in too much discussion, but I think one thing when you look at non separate acts in the sexual assault context, this could be -- an example might be, a defendant, not this defendant, a defendant in the midst of digital penetration penetrates twice in a very short period of time with a finger, that is completely different than an event that I heard in this trial.

"And I paid close attention while the victim was testifying and a couple things rang true to me, one is she was very credible. I think the jury found that. The only counts that were lost by the people were counts that had really nothing to do with this victim. But more importantly, not only her credibility but her ability to recite the events. And even the defendant, in his statement to the police, partitions the events. There's an act of robbery. They you could say breaking -- into -- there's an act of entry into the building, there's an act of threat of force and robbery, there's an act of substantial movement to the bathroom. Once in the bathroom then there has to be a continuing intent; right? There has to be a goal in moving her to the bathroom, and the goal was to accomplish some act of sexual assault.

19

"But at that point where he decides to engage in sexual assault he has a plethora of choices for a sexual assault. He chooses one. Then he chooses another. And each time he chooses, that evidences a distinct, clear separate intent, which this court thinks is a distinct, clear, separate event and occasion. And that's why I don't have any problem in sentencing him to a consecutive term."

B. *Governing Law and Analysis*

Section 667.61, also known as the one strike law, "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes perpetrated by force, including rape, foreign object penetration, sodomy, and oral copulation." (*People v. Mancebo* (2002) 27 Cal.4th 735, 741, fns. omitted.) The Legislature enacted section 667.61 to ensure that serious sexual offenders receive long prison sentences regardless of their prior criminal records. (*People v. Wutzke* (2002) 28 Cal.4th 923, 929; see *People v. Luna* (2012) 209 Cal.App.4th 460, 465.)

In addition, section 667.61 requires imposition of "a *consecutive* sentence for each offense . . . if the crimes involve separate victims or involve the *same victim on separate occasions* as defined in subdivision (d) of Section 667.6." (§ 667.61, subd. (i), italics added; see *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1489.) Once the trial court resolves the issue of whether a defendant committed sex crimes on separate occasions, an appellate court may not overturn the result unless no reasonable trier of fact could have so found. (See *People v. Garza* (2003) 107 Cal.App.4th 1081, 1092; *People v. Plaza* (1995) 41 Cal.App.4th 377, 384.)

20

Section 667.6, subdivision (d) provides:  "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether . . . the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

A finding that a defendant committed the sex crimes on separate occasions does not require a break of any specific duration or any change in physical location.  (*People v. Jones* (2001) 25 Cal.4th 98, 104 [construing former § 667.6]; see also *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071 [also construing former § 667.6 and concluding a trial court at sentencing "could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions"].)

Here, the record shows that defendant committed at least two entirely separate and distinct acts of penetration of M.'s vagina.  Defendant admitted to police that he used three fingers to penetrate M.'s vagina about seven or eight times.  The record also shows that defendant penetrated M.'s vagina with his penis, as DNA later taken from inside M.'s vagina matched his profile.

21

That M. testified she thought defendant had his fingers and penis inside her vagina at the same time is not determinative here. For one thing, the record shows defendant made M. turn around so that her back was to him. In addition, M. testified she *thought* defendant had his fingers and penis inside of her at the same time. Moreover, the record shows that, at some point, defendant made M. turn off the light in the bathroom while he continued his sexual assault of her. And, of course, defendant admitted to police that he digitally penetrated M. seven or eight times, which evidence strongly supports the finding of the trial court that defendant's use of his fingers to penetrate repeatedly M.'s vagina involved a separate, distinct and additional intent from his intent to penetrate her with his penis. As the statute instructs, the duration of time between the acts and the retention of the *opportunity to attack* again are not themselves determinative. (See § 667.6, subd. (d).)

Because we conclude a reasonable trier of fact could conclude that in between each of two separate offenses—digital penetration of M. multiple times and rape—defendant "had a reasonable opportunity to reflect upon his . . . actions and nevertheless resumed [his] sexually assaultive behavior" (see § 667.6, subd. (d); see also § 667.61, subd. (i)), we further conclude the trial court properly imposed consecutive sentences on defendant of 25 years to life on counts 5 and 6 as mandated under section 667.61.

However, in light of our high court's opinion in *Garcia*, we conclude the true finding of the jury that defendant committed counts 5 and 6, forcible rape and rape by a

22

foreign object, respectively, during the commission of a burglary (§ 667.61, subd. (e)(2)) must be reversed.

IV

Restitution Fine

At sentencing, the trial court ordered defendant to pay a restitution fine in the amount of $10,000, as recommended in the probation report. The record shows the court did not make any specific factual findings or state the reason or reasons it imposed the fine in this amount, which was and remains the statutory maximum under subdivision (b)(1) of section 1202.4. The record shows defendant did not object to the restitution fine.

In 2011, when the crimes at issue were committed, section 1202.4, subdivision (b) then provided: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." In the case of a felony conviction, the minimum restitution fine was $200 and the maximum fine was $10,000.[4] (Former § 1202.4, subd. (b)(1).) The fine was to "be set at the discretion of the court and commensurate with the seriousness of the offense." (*Ibid.*)

Former section 1202.4, subdivision (d) provided: "In setting the amount of the fine pursuant to subdivision (b) in excess of the two hundred-dollar ($200) . . . minimum, the

---

[4] Subsequent amendments to section 1202.4 raised the statutory minimum but did not change the statutory maximum of $10,000, which, as noted, was the amount imposed here by the trial court.

court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include his or her future earning capacity. A defendant shall bear the burden of demonstrating his or her inability to pay. *Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required*." (Italics added.)

Defendant asserts that under *Southern Union Co. v. United States* (2012) ___ U.S. ___ [132 S.Ct. 2344] (*Southern Union Co.*), the trial court's imposition of the $10,000 restitution fine violated his constitutional rights to a jury trial and due process. He claims that his conviction alone was insufficient to support the imposition of the fine, that the fine was punishment and that, therefore, the issue of the amount of the fine should have been submitted to the jury and proved beyond a reasonable doubt.

As the People point out, a similar contention was rejected in *People v. Kramis* (2012) 209 Cal.App.4th 346 (*Kramis*). The *Kramis* court explained: "In *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), the United States Supreme Court held, 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime

24

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'  As the United States Supreme Court explained in *Blakely v. Washington* (2004) 542 U.S. 296, 303 . . . '[T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'  (Some italics omitted.)  Stated differently, '[T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he [or she] may impose *without* any additional findings.'  [Citation.]  Therefore, in sentencing a defendant, a judgment may not 'inflict[ ] punishment that the jury's verdict alone does not allow.'  [Citation.]  In *Southern Union Co.*, the United States Supreme Court held *Apprendi* applies to the imposition of criminal fines.  [Citation.]  The statutory fine imposed in *Southern Union Co.* was $50,000 for *each day* of violation.  In other words, the amount of the fine was tied to the *number of days the statute was violated.*  In *Southern Union Co.*, the trial court, not the jury, made a specific finding as to the number of days of violation.  The United States Supreme Court held the district court's factual finding as to the number of days the defendant committed the crime violated *Apprendi*.  [Citation.]

"*Southern Union Co.* does not impact the restitution fine imposed in the present case.  *Apprendi* and *Southern Union Co.* do not apply when, as here, the trial court exercises its discretion within a statutory range.  [Citations.]  As the United States Supreme Court held in *Apprendi*, '[N]othing in [the common law and constitutional history] suggests that it is impermissible for judges to exercise discretion—taking into

25

consideration various factors relating both to the offense and offender—in imposing a judgment *within the range* prescribed by statute.' [Citations.] As the Court of Appeal for the Fifth Appellate District noted in [*People v.*] *Urbano* [(2005)] 128 Cal.App.4th [396], '*Apprendi* distinguishes a "sentencing factor"—a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense"—from a "sentence enhancement"—"the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence." [Citation.]' [Citation.] Nothing in *Southern Union Co.* alters that holding. Under the applicable version of section 1202.4, subdivision (b)(1), absent compelling and extraordinary circumstances, the trial court was required to impose a restitution fine in an amount between $200 and $10,000. The $10,000 section 1202.4, subdivision (b) restitution fine imposed in the present case was within that statutory range. The trial court did not make any factual findings that increased the potential fine beyond what the jury's verdict—the fact of the conviction— allowed. Therefore, *Apprendi* and its progeny do not preclude its imposition. [Citation.]" (*Kramis*, *supra*, 209 Cal.App.4th at pp. 350–352.)

We find the reasoning in *Kramis* persuasive on this issue. Given that the trial court here imposed a fine *within the range* prescribed by statute, we conclude the court properly exercised its discretion in ordering the $10,000 restitution fine, particularly in light of the seriousness and gravity of the offenses and the circumstances of their

commission and the psychological trauma experienced by M. and her family as a result of the sexual assault, as she vividly described to the court during defendant's sentencing.

V

Correction of the Abstract of Judgment

At sentencing, the trial court in its oral pronouncement of judgment imposed consecutive terms of 25 years to life each on counts 5 and 6 and stayed pursuant to section 654 the seven-year term on count 3, kidnapping, and its section 12022.53, subdivision (b) enhancement.  The minute order confirms the court's oral pronouncement of judgment.  However, the abstract of judgment indicates that sentence on count 5 and its enhancement were stayed and that the term of 25 years to life was imposed on count 3.

Defendant contends—and the People agree—that the abstract of judgment should be corrected to stay the term for count 3 and its enhancement and to impose the 25 years to life term on count 5 to run consecutively to the unstayed terms.  We too agree.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [noting that an "abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize"].)

DISPOSITION

Defendant's burglary conviction in count 4 is reversed, in accordance with the directive of our high court in *Garcia*, as is the true finding that defendant committed counts 5 and 6 during the commission of that burglary.  The trial court is directed to

27

prepare an amended abstract of judgment (1) to show this change and (2) to correct the judgment of conviction as pronounced by the court at sentencing, namely, staying the term for count 3 and its enhancement and imposing the 25-years-to-life term on count 5 to run consecutively to the unstayed terms.  The trial court is further directed to forward a certified copy of this amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                                              BENKE, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.

28